DECISION AND JOURNAL ENTRY
{¶ 1} Defendant, James R. Stalnaker, appeals from the judgment of the Summit County Court of Common Pleas finding him guilty of burglary and sentencing him to four years in prison. We affirm.
 {¶ 2} Defendant was charged with burglary, in violation of R.C. 2911.12(A)(1), on October 2, 2002. A jury trial ensued. After the jury found Defendant guilty of burglary, the trial court sentenced Defendant to five years in prison. Defendant then filed a pro se motion for post-conviction relief based on ineffective assistance of trial counsel, which was later amended to include ineffective assistance of appellate counsel due to appellate counsel's failure to file a timely appeal. The State agreed to a vacation of sentence and subsequent re-sentencing to allow Defendant to file a timely appeal. After Defendant voluntarily dismissed his motion for post-conviction relief, Defendant's original sentence was vacated and the trial court re-sentenced Defendant to four years in prison for the burglary conviction. Defendant timely appealed raising two assignments of error.
 ASSIGNMENT OF ERROR I
"[Defendant] was deprived of his Sixth Amendment right to effective assistance of counsel when trial counsel failed to adequately present available defenses in accord with professional norms, thereby denying [Defendant] a fair trial."
 {¶ 3} In his first assignment of error, Defendant argues that trial counsel was prejudicially ineffective. Defendant alleges that trial counsel failed to introduce evidence of multiple defenses which would have changed the outcome of his trial, including: (1) that he was physically incapable of committing the alleged crime because he was intoxicated and in a diabetic stupor, (2) that Defendant lacked the required mens rea necessary to commit the alleged crime due to his diabetic condition, and (3) that a woman named Karen Snyder ("Karen") let him into the home where he was discovered. We find Defendant's contentions meritless.
 {¶ 4} This court employs a two step process, as described inStrickland v. Washington (1984), 466 U.S. 668, 687,80 L.Ed.2d 674, in evaluating an ineffective assistance of counsel claim. First, the court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." State v. Bradley (1989), 42 Ohio St.3d 136, 141;State v. Lytle (1976), 48 Ohio St.2d 391, 396. Licensed attorneys are presumed competent in Ohio. Lytle,48 Ohio St.2d at 397. Defendant must overcome the "presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, quoting Michelv. Louisiana (1955), 350 U.S. 91, 100 L.Ed. 83.
 {¶ 5} Second, the court must determine if prejudice resulted to Defendant from counsel's ineffectiveness. Bradley,42 Ohio St.3d at 141-42. Prejudice exists where there is a reasonable probability that the trial result would have been different but for the alleged deficiencies of counsel. Id. at paragraph three of the syllabus. Defendant bears the burden of proof, and must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48-49, quoting Strickland, 466 U.S. at 687.
 {¶ 6} This court need not address both elements in any particular order — if we find there was no prejudice to Defendant by defense counsel's acts, we need not address whether defense counsel's acts were actually deficient. See Bradley,42 Ohio St.3d at 143. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." Id. In this case, we find that Defendant has failed to show that prejudice resulted from trial counsel's acts.
 {¶ 7} First, Defendant's argument that he could not physically crawl through the window due to his intoxication and alleged diabetic stupor is speculation. Pictures of the window in question were admitted at trial. Testimony indicated that the window could open approximately eight inches. The jury heard this evidence, as well as the conflicting evidence related to Defendant's intoxicated state. The jury believed that Defendant was capable of getting through the window. Given that the jury is responsible for making determinations of fact, we cannot find that defense counsel was ineffective for failing to belabor this point.
 {¶ 8} As to Defendant's argument that his diabetic stupor would have left him incapable of entering the home through that window, or to form the necessary mens rea for the alleged crime, we are left with mere speculation as to (1) whether Defendant was in a diabetic stupor the evening of the alleged crime, (2) whether a diabetic stupor would prevent Defendant from entering the house through the window, presumably because he was in a state of semi-consciousness at the time, (3) whether a medical professional could tell from the evidence that the diabetic stupor had existed for a period of time that would preclude Defendant's entrance into the home through the window, and (4) whether an individual in a diabetic stupor would be capable of voluntary action equaling the required mens rea. Defendant has offered no suggestion as to who could testify as to any of these questions, nor has he offered evidence as to the answers to those questions. "Appellant's argument is based entirely upon speculation that such a witness exists, and speculation as to what the testimony of such a witness would be." State v. Ramos, 9th Dist. No. 21286, 2003-Ohio-2637, at ¶ 22. Defendant, therefore, has failed to show prejudice under Strickland. See id.
 {¶ 9} As to the failure of defense counsel to call Karen as a witness, we note that a subpoena was issued by the court for "K. Snyder." She, simply, did not appear at trial or testify. Defendant has engaged in speculation as to what the alleged witness, Karen, would testify to. Where this Court has "absolutely no means of determining what [a witness'] testimony would have, in fact, included * * * we refuse to engage in speculation and supposition as to what the extent of that testimony might have shown." State v. Hodge (Jan. 3, 2001), 9th Dist. No. 3072-M, at 9. Because we have no way of knowing what Karen would have said at trial, we cannot say that her failure to appear prejudicially affected Defendant.
 {¶ 10} We find that Defendant has failed to show that counsel's acts prejudiced him at trial below. Rather, his arguments are based on pure speculation as to what additional evidence might have showed. Speculation is not enough to succeed on an ineffective assistance of counsel claim. See Hodge, supra, at 9; Ramos at ¶ 22. Accordingly, we overrule Defendant's first assignment of error.
 ASSIGNMENT OF ERROR II
"Pursuant to Article IV [section] 3(B)(3) of the Ohio Constitution, the verdict of guilty was against the manifest weight of the evidence presented at trial."
 {¶ 11} In his second assignment of error, Defendant argues that his conviction was against the manifest weight of the evidence. Specifically, Defendant alleges that the State failed to "convincingly demonstrate that [Defendant] purposefully entered the home with the intent to commit a criminal offense." Defendant also asserts that the evidence illustrated that Defendant was physically incapable of committing the crime in the manner suggested by the State. We disagree.
 {¶ 12} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at 3, citing State v.Thompkins, 78 Ohio St.3d 380, 390, 1997-Ohio-52 (Cook, J., concurring). When a defendant maintains that his conviction is against the manifest weight of the evidence:
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This power is to be invoked only in extraordinary circumstances where the evidence presented at trial weighs heavily in favor of a defendant. Id.
 {¶ 13} R.C. 2911.12(A)(1), the burglary statute states:
"No person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense[.]"
Trespass includes not only originally entering onto land without privilege to do so, but also remaining on that land without privilege to do so. See R.C. 2911.21.
 {¶ 14} David Trachsel ("Trachsel"), testified that he inherited the house at 556 East Crosier Street, in Akron, Ohio, and all its contents, from his aunt. At the time of trial, he had owned the home for two years, and was continually refurbishing it. He kept his clothing and personal possessions at the house, and would spend approximately sixty percent of his time living at the residence. His son and two nephews also stayed regularly at the home.
 {¶ 15} Gina Marie Ross ("Ross") testified that on September 23, 2002, she picked up Defendant (her half-brother) and "[s]ome lady named Karen" from a parking lot near Trachsel's house. She stated that Defendant was intoxicated and wanted to stay at Ross's home over night. Instead, Ross drove her vehicle to Trachsel's house where she dropped off Defendant and Karen at approximately 7:25 p.m. She then watched Defendant and Karen enter the house through the back, enclosed porch. Ross did not recall any gate blocking the driveway. When asked about Karen, Ross testified that "[s]he had sandy blond hair, and she was maybe about 120 pounds." Ross had not seen Karen since that evening nor had she attempted to locate Karen.
 {¶ 16} Around 9:00 p.m., Trachsel arrived at his home with a friend, Cheryl Peters ("Peters"). Both recalled unlocking three things to get into his home: a six-foot gate in his fence which spanned the driveway, the door to his enclosed porch, and finally the door into the home. Both also noticed that a screen had been removed from a window and left on the porch. Trachsel testified that he knew that screen had not been on the porch when he left earlier that same evening. When Trachsel entered his house, he noticed that a lamp had been knocked over. Peters testified that she then heard a noise from upstairs, and that Trachsel went to investigate. He found Defendant "trying to hide under the bed" in a bedroom. Trachsel recalled that Defendant was laying face down and not moving, but Trachsel did not think Defendant was asleep. Trachsel actually "picked [Defendant] up" off of the floor. Trachsel denied thinking that Defendant was intoxicated.
 {¶ 17} Trachsel asked Defendant what he was doing there, and Defendant replied that "he didn't know." Trachsel then led Defendant downstairs, and sat him in a chair while Peters called the police. Defendant did not "sit willingly and wait for the police[,]" but instead "proceeded to run away, so [Trachsel] went ahead and grabbed [Defendant] and held him there." Peters remembered that Trachsel actually had to hold Defendant on the floor to prevent him from escaping. While they were waiting for the police, Defendant told Trachsel that a woman had let him into the house.
 {¶ 18} Peters recalled needing to unlock both the front door and screen door when admitting the police to the house. Trachsel explained to the police that he had found Defendant in his home. He surmised that Defendant had climbed into the house through two windows which were unlocked, one of which remained partially open and without a screen. The inner window, apparently, would only open to a height of approximately eight inches. One officer at the scene, however, denied ever thinking that there was any issue as to whether Defendant could have physically fit through the windows into the residence.
 {¶ 19} The police searched the home and discovered some insulation pulled down from an upstairs closet ceiling. The police also searched Defendant, and Trachsel remembered that they found "either a locket or some kind of pin for [a] lady's hair" as well as some tobacco on Defendant. Trachsel was uncertain whether the hair pin belonged to him or not, as it would have been one of his aunt's possessions. He did tell the police that he did not think anything was missing from the home. The police dusted the windows for fingerprints. One officer testified that he could clearly see handprints on one of the windows, but that he "couldn't get discernible detail on the fingerprints" due to the amount of dust on that window.
 {¶ 20} Three officers testified about Defendant's condition that evening. Officer Edward Stewart ("Officer Stewart") escorted Defendant to a police vehicle. Officer Stewart indicated that Defendant was walking without aid, but that Defendant smelled like alcohol and said he was nauseous. Officer Stewart called a paramedic unit to the scene. The paramedics used what Officer Stewart believed was ammonia "because they thought [Defendant] was out of it * * * or asleep or unconscious." However, the paramedics released Defendant to the police because they felt there was no health emergency.
 {¶ 21} Officer John Nouse did not recall thinking that anything was wrong with Defendant at the scene, but stated that Defendant "passed out" and was unresponsive at the police department. He thought that Defendant may have been slightly intoxicated, but he did not know if Defendant may have been in a diabetic stupor. Officer Dale Riley ("Officer Riley") testified that Defendant was uncooperative at first, and would not tell the police who he was. He helped escort Defendant to the police vehicle, but did not think that Defendant was intoxicated and did not smell any alcohol on Defendant. He admitted, though, that Officer Stewart "got closer in [Defendant's] face than [he] did."
 {¶ 22} Officer Riley also remembered that Defendant asserted that either a Karen Snyder or a Kathy Snyder let him into the house, but "[Defendant] would never tell [the police] where she lived or who she was at that time, to figure out if she did exist." Trachsel denied knowing anyone named Karen or Kathy Snyder, and was certain he had never given anyone by that name keys to his house.
 {¶ 23} One day after the incident, Trachsel first noticed a duffel bag filled with his aunt's jewelry boxes in the bedroom opposite the bedroom where he found Defendant. Trachsel recalled seeing the duffel bag in his aunt's house prior to that occasion, but had not placed the jewelry boxes in the bag. He also noted that "the knobs were broken off [of one of the jewelry boxes] like somebody was trying to force the drawers open." The police did not dust the jewelry for fingerprints because "[t]here was really nothing that could have been dusted."
 {¶ 24} After reviewing the evidence, we cannot say that the verdict was against the manifest weight of the evidence. While the State and Defendant introduced conflicting testimony at trial as to the issue of consent to enter Trachsel's home, the mere fact that the jury chose to believe the testimony of the prosecution's witnesses does not render a verdict against the manifest weight. State v. Moore, 9th Dist. No. 03CA0019, 2003-Ohio-6817, at ¶ 18, citing State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. We overrule Defendant's second assignment of error.
 {¶ 25} We overrule Defendant's two assignments of error and affirm the judgment of the Summit County Court of Common Pleas.
Judgment affirmed.
Baird, P.J., Batchelder, J. concur.