DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Sam Hairston, III, aka Charles Williams, appeals from the conviction judgment entry entered in the Lorain County Court of Common Pleas. This Court affirms in part and vacates in part.
 I. {¶ 2} On November 14, 2002, the Lorain County Grand Jury indicted Appellant as follows: Count One, aggravated murder, in violation of R.C. 2903.01(B), with a firearm specification, as defined in R.C. 2923.11, an unspecified felony; Count Two, aggravated murder, in violation of R.C. 2903.01(A), with a firearm specification, as defined in R.C. 2923.11 and a witness specification, pursuant to R.C. 2929.04(A)(8), an unspecified felony; Count Three, aggravated murder, in violation of R.C.2903.01(A), with a firearm specification, as defined in R.C.2923.11 and a detection specification, pursuant to R.C.2929.04(A)(3), an unspecified felony; and Count Four, aggravated robbery, in violation of R.C. 2911.01(A)(1), with a firearm specification, as defined in R.C. 2923.11, a first-degree felony.
 {¶ 3} These charges arose from an illicit drug deal in the early morning hours of January 29, 1991. Richard Dawson and his friend, Richard Movrin, were patrons at a local bar on the evening of January 28, 1991. While at the bar, Mr. Movrin saw another friend of his, Richard Newson. When it was time to leave, Mr. Newson asked for a ride to his girlfriend's house in Wilkes Villas. Mr. Dawson drove, while Mr. Movrin sat in the front passenger seat and Mr. Newson was in the backseat. Unbeknownst to Mr. Dawson, Mr. Movrin had solicited Mr. Newson for crack cocaine.
 {¶ 4} Upon dropping Mr. Newson off at Wilkes Villas, he quickly returned to the backseat of the car with two other men, Appellant and David Hollis. While in the car, Mr. Hollis produced a gun and fatally shot Mr. Movrin in the back. The three men then exited the backseat and went around to the back of a building. There Appellant allegedly shot Mr. Newson in the face for fear that Mr. Newson would not keep quiet about the prior events. In the meantime, Mr. Dawson drove Mr. Movrin to the hospital where he expired. Mr. Hollis remained in the Lorain County area following these incidents, while Appellant left the area. Appellant was eventually found in a Massachusetts prison under the assumed name, Charles Williams.
 {¶ 5} On November 3, 2004, Appellant was arraigned and pled not guilty. The matter proceeded to a capital jury trial on June 6, 2005. The trial court granted a Crim.R. 29 motion with respect to Count One, thereby reducing the original charge of aggravated murder to involuntary manslaughter. The jury found Appellant guilty of Count Two, aggravated murder with a firearm and witness specification and Count Three, aggravated murder with a firearm specification. Appellant was found not guilty on the remaining counts and specifications. As a guilty finding under a witness specification (R.C. 2929.04(A)(8)) involves the possibility of capital punishment, the trial court proceeded with the mitigation phase to determine Appellant's sentence. See R.C.2929.03(C)(2)(b) and R.C. 2929.04. The jury returned a sentence of life imprisonment with parole eligibility after serving thirty years. The trial court sentenced Appellant to a total of thirty-three years in prison[1] and ordered Appellant to pay restitution for Mr. Newson's medical and funeral expenses.
 {¶ 6} Appellant timely appealed his conviction, asserting fourteen assignments of error for review. For ease of review, we will combine some of the assignments of error.
 II. A. First Assignment of Error
"THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO A PUBLIC TRIAL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION[.]"
 {¶ 7} In his first assignment of error, Appellant alleges two errors. First, Appellant contends that he was denied the right to a public trial as the trial court closed the courtroom during closing arguments. Appellant submits it was plain error for the trial court to close the courtroom. Further, Appellant argues his trial counsel was ineffective as they did not object to the trial court closing the courtroom for closing arguments. We disagree with both arguments.
1. Plain Error
 {¶ 8} "[T]he right to a public trial is not absolute and an order barring spectators from observing a portion of an otherwise public trial does not necessarily introduce error of constitutional dimension." State v. Whitaker, 8th Dist. No. 83824, 2004-Ohio-5016, at ¶ 11. The right to a public trial, along with all constitutional rights, may be forfeited due to the failure to timely assert the right. Peretz v. United States
(1991), 501 U.S. 923, 936, quoting Yakus v. United States.
(1944), 321 U.S. 414, 444. Ordinarily, to preserve a trial court error for appeal, an objection must be timely raised to the trial court, where the purported error may be corrected, or else the objection is forfeited; it may not be raised for the first time on appeal. United States v. Olano (1993), 507 U.S. 725, 731. See, also, State v. McKee (2001), 91 Ohio St.3d 292, 299 fn. 3 (Cook, J., dissenting). See, e.g., State v. Geiger, 9th Dist. No. 22073, 2004-Ohio-7189, at ¶ 12; State v. Riley, 9th Dist. No. 21852, 2004-Ohio-4880, at ¶ 27; State v. Dent, 9th Dist. No. 20907, 2002-Ohio-4522, at ¶ 6.
 {¶ 9} There is a fine distinction between the terms waiver and forfeiture as applied to the preservation of objections for appeal. McKee, 91 Ohio St.3d at 299 fn. 3 (Cook, J., dissenting). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the `intentional relinquishment or abandonment of a known right.'" Olano,507 U.S. at 733, quoting Johnson v. Zerbst (1938), 304 U.S. 458,464. Unfortunately,
"courts have so often used [waiver and forfeiture] interchangeably that it may be too late to introduce precision. Nevertheless, the distinction retains some significance in the context of Crim.R. 52(B). A right that is waived in the true sense of that term cannot form the basis of any claimed error under Crim.R. 52(B). On the other hand, mere forfeiture does not extinguish a claim of plain error under Crim.R. 52(B)." (Internal quotations and citations omitted.) McKee, 91 Ohio St.3d at 299
fn. 3 (Cook, J., dissenting).
 {¶ 10} In this matter, Appellant's trial counsel did not make any statements or objections during Appellee's request to close the courtroom during closing arguments. Appellant's failure to make an objection resulted in a forfeiture of his objection regarding the closing of the courtroom in violation of his right to a public trial. See Levine v. United States (1960),362 U.S. 610, 618-19. Accordingly, Appellant's forfeiture allows him the possibility for appellate review via a claim of plain error.
 {¶ 11} However, Appellant's brief does not adequately present a claim of plain error under his first assignment of error. Appellant's brief makes a conclusory statement that plain error occurred, but does not provide this Court with any reasoning in support of this position. The appellant bears the burden of affirmatively demonstrating the error on appeal and substantiating his or her arguments in support. App.R. 16(A)(7); Loc.R. 7(A)(7). See Figley v. Corp, 9th Dist. No. 04CA0054,2005-Ohio-2566, at ¶ 8. Moreover, it is not the duty of this Court to develop an argument in support of an assignment of error, even if one exists. State v. Tanner, 9th Dist. No. 04CA0062-M, 2005-Ohio-998, at ¶ 24; Prince v. Jordan, 9th Dist. No. 04CA008423, 2004-Ohio-7184, at ¶ 40; Klausman v. Klausman,
9th Dist. No. 21718, 2004-Ohio-3410, at ¶ 29. Accordingly, as Appellant failed to develop his plain error argument, we do not reach the merits and decline to address this argument.
2. Ineffective Assistance of Counsel
 {¶ 12} Additionally under the first assignment of error, Appellant alleges his trial counsel were ineffective as they failed to object to the trial court closing the courtroom during closing arguments. Specifically, Appellant feels that if his trial counsel would have objected, there either would not have been a violation of his right to public trial and/or the issue would have been preserved for appeal. Appellant argues this failure constitutes ineffective assistance of counsel. We disagree.
 {¶ 13} The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. McMann v. Richardson (1970), 397 U.S. 759, 771. To prevail on a claim of ineffective assistance of counsel, Appellant must meet the two-prong test established in Stricklandv. Washington, (1984), 466 U.S. 668, 687.
"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id.
 {¶ 14} The failure to object to an error may be justified as a trial tactic and thus does not sustain a claim of ineffective assistance of counsel. State v. Gumm (1995), 73 Ohio St.3d 413,428; State v. Windham, 9th Dist. No. 05CA0033, 2006-Ohio-1544, at ¶ 24, quoting State v. Taylor, 9th Dist. No. 01CA007945, 2002-Ohio-6992, at ¶ 76. Strategic trial decisions are left to the deference of trial counsel and are not to be second-guessed by appellate courts. State v. Carter (1995), 72 Ohio St.3d 545,558.
 {¶ 15} The defendant has the burden of proof and must overcome the strong presumption that counsel's performance was adequate or that counsel's action might be sound trial strategy.State v. Smith (1985), 17 Ohio St.3d 98, 100. "Ultimately, the reviewing court must decide whether, in light of all the circumstances, the challenged act or omission fell outside the wide range of professionally competent assistance." State v.DeNardis (Dec. 29, 1993), 9th Dist. No. 2245, at *2, citingStrickland, 466 U.S. at 689. Furthermore, an attorney properly licensed in Ohio is presumed competent. State v. Lott (1990),51 Ohio St.3d 160, 174.
 {¶ 16} In demonstrating prejudice, the defendant must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. Further, an appellate court need not analyze both prongs of the Strickland test if it finds that Appellant failed to prove either. State v. Ray, 9th Dist. No. 22459, 2005-Ohio-4941, at ¶ 10.
 {¶ 17} Although either step in the process may be dispositive, we will address the deficiency question first in this analysis, based on the particular error Appellant asserts in his first assignment of error. Appellant alleges his trial counsel was deficient for failing to object to the trial court closing the courtroom for closing arguments. However, as a matter of law, an attorney's decision as to whether or not to object at certain times during trial is presumptively considered a trial tactic or strategy that we will not disturb. State v. Downing,
9th Dist. No. 22012, 2004-Ohio-5952, at ¶ 23, citing State v.Fisk, 9th Dist. No. 21196, 2003-Ohio-3149, at ¶ 9; State v.Phillips (1995), 74 Ohio St.3d 72, 85. Accordingly, Appellant has failed to meet his burden of proof regarding how his trial counsel's performance was deficient.
 {¶ 18} Further, Appellant failed to show how trial counsel's failure to object to closing the courtroom would have resulted in a different trial verdict. In an effort to preserve decorum and exercise control of the courtroom, the trial court merely limited the ingress and egress of persons during the closing arguments. See E.W. Scripps Co. v. Fulton (1955), 100 Ohio App. 157, 168. No one was excluded from the courtroom. See State v. Cottrell,
8th Dist. No. 81356, 2003-Ohio-5806, at ¶ 24-25. Anyone who wished to observe closing arguments was permitted in the courtroom as long as they were seated before arguments began. See id. The courtroom was closed in an effort to prevent distractions to the jury, so that they could listen to the closing arguments without interruptions. Appellant does not address how this affected the trial result. Instead, Appellant focuses on how the failure to object affects his issues on appeal. This argument attempts to show the effect on the appeal, but does not prove that there is a "reasonable probability that, * * *, the resultof the trial would have been different." (Emphasis added.)Bradley, 42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 19} Appellant's charges do not rise to the level of ineffective assistance of counsel. See Strickland,466 U.S. at 687. Accordingly, this assignment of error is overruled.
 B. Second Assignment of Error
"THE APPELLANT'S GRAND AND PETIT JURY'S [sic] UNDER REPRESENTATION [sic] OF AFRICAN[-]AMERICANS AND HISPANIC AMERICANS WAS IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE FEDERAL CONSTITUTION."
 {¶ 20} Appellant's second assignment of error alleges that minorities were underrepresented in the grand and petit juries involved in this matter. Contrary to his assignment of error, Appellant's brief only addresses the petit venire. Appellant specifically points out that there were only two African-Americans and no Hispanic Americans in the venire of fifty-six potential jurors who responded to the call for petit jury duty. Appellant claims that the process utilized in producing the petit venire systematically excluded minorities, and thus an unfair cross-section resulted. We disagree.
1. Grand Jury
 {¶ 21} While Appellant's captioned assignment of error includes underrepresentation in the grand jury, Appellant's brief does not present any arguments regarding the grand jury. The appellant bears the burden of affirmatively demonstrating the error on appeal and substantiating his or her arguments in support. App.R. 16(A)(7); Loc.R. 7(A)(7). See Figley at ¶ 8. Moreover, it is not the duty of this Court to develop an argument in support of an assignment of error, even if one exists.Tanner at ¶ 24; Prince at ¶ 40; Klausman at ¶ 29. Accordingly, as Appellant failed to develop his underrepresentation of the grand jury argument, we do not reach the merits and decline to address this argument.
2. Petit Jury
 {¶ 22} Appellant asserts his petit jury venire did not represent a fair cross-section of the population of Lorain County and thus he was denied his right to an impartial jury under theSixth and Fourteenth Amendments of the United States Constitution. Accordingly, Appellant argues that the trial court "should have struck the venire and assembled a new one that fairly represented the community."
 {¶ 23} The United States Supreme Court has held that petit jury selections are subject to the provisions of the Sixth andFourteenth Amendments of the United States Constitution. Statev. Fulton (1991), 57 Ohio St.3d 120, 122-23, citing Duncan v.Louisiana (1968), 391 U.S. 145. A material aspect of theSixth Amendment right to a jury trial includes "the selection of a petit jury from a representative cross[-]section of the community." (Internal quotations omitted.) Fulton,57 Ohio St.3d at 123, quoting Taylor v. Louisiana (1975), 419 U.S. 522,528. However, "[there is] no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." Fulton,57 Ohio St.3d at 123, quoting Taylor, 419 U.S. at 538.
"In order to establish a violation of the fair representative cross-section of the community requirement for a petit jury array under the Sixth and Fourteenth Amendments to the United States Constitution, a defendant must prove: (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." Fulton, 57 Ohio St.3d 120, paragraph two of the syllabus, citing Duren v. Missouri (1979),439 U.S. 357, 364.
 {¶ 24} In this case, Appellant cannot establish a violation of the Sixth Amendment fair representation cross-section of the community requirement as he failed to present any evidence as the second and third prongs. The parties do not dispute that African-Americans and Hispanic Americans are distinctive groups in Lorain County. However, as to the second prong, Appellant failed to "demonstrate the percentage of the community made up of the group alleged to be underrepresented." Fulton,57 Ohio St.3d at 123, citing Duren, 439 U.S. at 364. The trial court suggested to Appellant that the "African-American community takes up about eight percent of Lorain County, and * * * the Latino community picks up about six percent of the Lorain County population." However, Appellant cannot rely on the trial court's estimates as Appellant bears the burden of providing the trial court with evidence of the demographic makeup of Lorain County. But Appellant did not provide the trial court with any evidence and instead based his argument on "[w]hatever the percentage is." Appellant's failure to provide demographic or statistical analysis as to the percentage of African-Americans and Hispanic Americans is fatal to his claim of denial of his right to an impartial jury.
 {¶ 25} Further, Appellant failed to establish the third prong as he did not present any evidence that the lack of African-Americans and Hispanic Americans on his jury venire was due to systematic exclusion of these groups in the jury selection process. The crux of Appellant's argument in his brief was that the trial court improperly required a finding of intent to discriminate. However, that argument is not dispositive of the issue raised by Appellant.
 {¶ 26} At the trial court, Appellant argued that the creation of the jury venire based solely on voter rolls was systematically excluding African-Americans and Hispanic Americans and thus the venire should be formed from the registered drivers of Lorain County. The trial court points out Appellant's failure to provide any evidence, thus resulting in a conclusory statement.
"[The trial court] can't assume [Appellant is] right until [he] give[s] [the trial court] some sort of statistics that would indicate that the fact of the utilization of the elector rolls underrepresents people of either a certain ethnic background or a racial background."
Nor, did Appellant provide the trial court with any statistical data to show the alleged continuous exclusion of the minorities in the venire over a length of time. See Duren,439 U.S. at 366. "[U]nderrepresentation on a single venire is not systematic exclusion." (Emphasis omitted.) State v. McNeil (1998),83 Ohio St.3d 438, 444.
 {¶ 27} Additionally, the United States Supreme Court granted the States "much leeway in [the] application [of the fair cross-section principle]. The States remain free to prescribe relevant qualifications for their jurors." Fulton,57 Ohio St.3d at 123, quoting Taylor, 419 U.S. at 538. The Ohio Supreme Court has held that,
"the use of voter registration rolls as exclusive sources for jury selections is constitutional and does not systematically, [or] intentionally, exclude any [economic, social, religious, racial, political and geographical group of the community]." (Internal quotations omitted.) State v. Moore (1998),81 Ohio St.3d 22, 28, quoting State v. Johnson (1972),31 Ohio St.2d 106, 114.
Further, R.C. 2313.08(B) permits each county to compile its jury list either (1) exclusively from the list of electors certified by the county board of elections, or (2) from that list, combined with the list of licensed drivers certified by the Registrar of Motor Vehicles.
 {¶ 28} The jury commissioners in Lorain County have the discretionary authority to include drivers, with qualified licenses issued in Lorain County, to the pool of jurors. Statev. Szakal (May 29, 1985), 9th Dist. No. 3794, at *1. However, Lorain County has elected to utilize the elector list solely. In this case, the trial court repeatedly advised Appellant as to the procedure employed by the jury commissioners in forming the jury pools. Prospective jurors in Lorain County are picked at random, "like a lottery system, * * *, by the computer" thus, eliminating the chance of systematic exclusion of any group. Despite the trial court's repeated requests to Appellant to "present some evidence that there was something done either by the Jury Commissioners or [the] Board of Elections or by the court representatives to restrict the number of those of African-American descent," Appellant never presented any evidence and failed the third prong under Duren.
 {¶ 29} While the trial court provided information establishing compliance with the Ohio statute and the federal constitution, Appellant failed to present any evidence that the use of the voter rolls systematically excluded African-Americans and Hispanic Americans. The single occurrence of underrepresentation in Appellant's jury venire was insufficient to support his claim of systematic exclusion. Additionally, Appellant failed to provide evidence regarding the demographic composition of Lorain County. Accordingly, Appellant'sSixth Amendment challenge must fail.
 {¶ 30} The Fulton court further stated that
"[a] defendant may also reasonably bring a federal equal protection challenge to the selection and composition of the petit jury by adducing statistical evidence which shows a significant discrepancy between the percentage of a certain class of people in the community and the percentage of that class on the jury venires, which evidence tends to show discriminatory purpose, an essential element of such cases." Fulton,57 Ohio St.3d at 123-24.
Again, Appellant did not provide any statistical data to show the "underrepresentation [of a distinct group] over a significant period of time" or "expose the selection procedure as susceptible of abuse or racially partial." McNeil,83 Ohio St.3d at 444, citing Fulton, 57 Ohio St.3d at 122-24. Accordingly, Appellant's Fourteenth Amendment challenge also fails.
 {¶ 31} Due to Appellant's repeated failures to support his argument with statistical data, the trial court did not err in denying his motion to strike the jury and to establish a new venire containing registered drivers. Accordingly, Appellant's assignment of error as to the petit jury is overruled.
 {¶ 32} Appellant's second assignment of error is overruled.
 C. Third Assignment of Error
"COUNSEL'S FAILURE TO REQUEST AN INVESTIGATOR AND/OR OBTAIN AN INVESTIGATOR WAS INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FEDERAL CONSTITUTION AND PREJUDICE MUST BE PRESUMED UNDER THE UNIQUE FACTS OF THIS CASE."
 {¶ 33} In his third assignment of error, Appellant alleges his trial counsel was ineffective as they failed to request funding to hire an investigator. The underlying events of this matter occurred twelve years prior to the indictment. Appellant claims "[t]he [S]tate had absolutely no physical or scientific evidence" and "relied entirely on the testimony of two `eyewitnesses.'" Appellant argues his trial counsel should have hired an investigator to probe the eyewitnesses' background and to search for other favorable eyewitness accounts.
 {¶ 34} Further, Appellant argues trial counsel should have hired an investigator to gather "the necessary data to support the claims that the grand and petit juries violated the Sixth andFourteenth Amendments." Appellant argues the failure to hire an investigator violated the ABA guidelines, prejudice is presumed, and ineffective assistance of counsel established. We disagree.
 {¶ 35} In Strickland, the United States Supreme Court determined that "counsel has a duty to make reasonable investigations" and the "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. Further, the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases specifies that counsel has an obligation to conduct a "thorough and independent investigation" in capital cases. (2003), 31 Hofstra L.Rev. 913, 1015.
 {¶ 36} The Strickland holding and the American Bar Association's Guidelines only require trial counsel to perform a reasonable investigation, not to hire an investigator. Appellant's assignment of error only argues trial counsel's failure to hire an investigator, not trial counsel's failure to investigate. An attorney's decision not to hire an investigator does not equate to a failure to investigate and result in ineffective assistance of counsel. See State v. Scott (Sept. 29, 1988), 10th Dist. No. 88AP-346, at *6; State v. Suttles
(Feb. 27, 1995), 4th Dist. No. 94CA9, at *3. Accordingly, the failure to hire an investigator, for both the underlying case and for issues concerning the jury venire, is an insufficient basis for deficient performance.
 {¶ 37} Appellant's third assignment of error is overruled.
 D. Fourth Assignment of Error
"THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY ON `RESIDUAL DOUBT' OR ALLOWING COUNSEL TO ARGUE `RESIDUAL DOUBT' IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE FEDERAL CONSTITUTION."
 {¶ 38} In his fourth assignment of error, Appellant alleges the trial court prevented him from arguing and did not instruct the jury regarding residual doubt as a mitigating factor in this case. Appellant claims the jury may have recommended a lesser sentence had they been instructed on the application of residual doubt. We disagree.
 {¶ 39} Residual doubt is "a lingering uncertainty about facts, a state of mind that exists somewhere between `beyond a reasonable doubt' and `absolute certainty.'" State v. McGuire
(1997), 80 Ohio St.3d 390, 402, quoting Franklin v. Lynaugh
(1988) 487 U.S. 164, 188 (O'Connor, J., concurring). Residual doubt "has nothing to do with the nature and circumstances of the offense or the history, character, and background of the offender." McGuire, 80 Ohio St.3d at 403, citing State v.Watson (1991), 61 Ohio St. 3d 1, 19 (Resnick, J., dissenting).
 {¶ 40} There is no federal or state constitutional right of a defendant to introduce residual doubt evidence during the mitigation phase. Oregon v. Guzek (2006), 126 S.Ct. 1226,1231-32, citing Franklin, 487 U.S. at 174; State v. Green
(2000), 90 Ohio St.3d 352, 360. Accordingly, it is up to the states to set their own parameters regarding mitigating evidence, including residual doubt. Guzek, 126 S.Ct. at 1232.
 {¶ 41} In McGuire, 80 Ohio St.3d 390, syllabus, the Ohio Supreme Court determined "residual doubt is not an acceptable mitigating factor under R.C. 2929.04(B)," as it is irrelevant to determining a defendant's sentence. Accordingly, a defendant may not argue to the jury, nor may the trial court instruct the jury regarding residual doubt. Id. at 403.
 {¶ 42} Appellant's fourth assignment of error urging us to remand for re-sentencing is overruled.
 E. Fifth Assignment of Error
"THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING A MOTION FOR MISTRIAL WHEN THE STATE'S PRIMARY EYEWITNESS TESTIFIED HE PASSED A POLYGRAPH WITH RESPECT TO WHO SHOT THE NAMED VICTIM IN THE APPELLANT'S CONVICTION."
 {¶ 43} In Appellant's fifth assignment of error, he argues the trial court abused its discretion by denying his motion for mistrial. Appellant's motion for mistrial was based upon the State's eyewitness, David Hollis', unexpected comments regarding his polygraph test taken in relation to his trial. Appellant argues that the trial court's curative jury instruction was inadequate, and a mistrial was the only appropriate remedy. We disagree.
 {¶ 44} The decision whether to grant or deny a motion for mistrial "lies within the sound discretion of the trial court" and will not be reversed absent a showing of abuse of discretion.State v. Garner (1995), 74 Ohio St.3d 49, 59, citing State v.Glover (1988), 35 Ohio St.3d 18, 19; State v. Widner (1981),68 Ohio St.2d 188, 190. An abuse of discretion is more than an error of law or judgment, but rather, it is a finding that the court's attitude is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Under this standard of review, an appellate court may not merely substitute its judgment for that of the trial court. Pons v.Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621.
 {¶ 45} "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected; this determination is made at the discretion of the trial court." State v. Reynolds (1988),49 Ohio App.3d 27, 33. The granting of a mistrial is necessary only when a fair trial in no longer possible. State v. Franklin (1991),62 Ohio St.3d 118, 127, citing Illinois v. Somerville (1973),410 U.S. 458, 462-63.
 {¶ 46} In Ohio, the existence and results of a polygraph are admissible in a criminal trial to corroborate or impeach testimony only when the both sides stipulate to their admissibility. State v. Souel (1978), 53 Ohio St.2d 123, syllabus. Appellant claims the Appellee's primary eyewitness unexpectantly blurted out during cross-examination that he had taken a polygraph. Appellant explains that the existence of the polygraph was unknown to him and thus the parties had not stipulated to its use in the trial. As there was no stipulation to using the polygraph, Appellant contends the polygraph was inadmissible and its presentation to the jury was so prejudicial that the trial court's subsequent curative instruction was inadequate to repair the damage. Thus, Appellant argues that he was unable to receive a fair trial.
 {¶ 47} While Appellant makes valid arguments regarding the polygraph, it is important to note the sequence of events surrounding this alleged irregularity. Appellant learned of the polygraph during his cross-examination of Mr. Hollis. Upon Mr. Hollis' initial disclosure of the polygraph, Appellant pressed on with a line of questioning directly related to the polygraph.
Q: When did you come to acknowledge to the police, to the authorities, that you were the man who killed Mr. Ricky Movrin?
A: When I took a lie detector test and didn't pass it.
Q: When did you do that?
A: I don't know.
* * *
Q: And you were scheduled to go to trial, correct?
A: Yes.
Q: But you took a lie detector test and flunked?
A: I took a lie detector test and flunked the part of Movrin, not the part about Newson; just Movrin, so, you know.
Q: Now, speaking of lie detector tests?
A: Yeah.
Q: You told the police that you could beat them anyway, right?
A: I thought I could.
After the specific polygraph questions, Appellant continued questioning Mr. Hollis about the events of the evening in question and then concluded his cross-examination.
 {¶ 48} Appellee then began its re-direct examination of Mr. Hollis by following up on the Appellant's polygraph questions.
Q: And, on cross-examination, you responded to [Appellant's trial counsel] that you flunked the polygraph test with regard to Movrin?
[Appellant's Trial Counsel]: Objection, Your Honor.
Q: What does that mean?
[Appellant's Trial Counsel]: Objection, Your Honor.
This was the first, and only, question by Appellee regarding the polygraph. Upon hearing this question, Appellant, for the first time, objected and moved for a mistrial.
 {¶ 49} At the sidebar, Appellee argued that Appellant opened the door on the polygraph issue during his cross-examination and Appellee should be allowed to re-direct on the issue. Appellant strongly disagreed by stating that he "did not open the door. [Mr. Hollis] blurted it out. It was a set-up." The trial court did not feel that Appellant had intentionally "opened the door" with its initial question, nor had Appellee failed to control the witness. Instead, the trial court felt that Mr. Hollis would "say whatever he darn well pleased." Thereupon, the trial court sustained Appellant's objection, overruled Appellant's motion for mistrial, and issued an instruction to the jury to disregard any testimony regarding polygraphs.
 {¶ 50} While Appellant may not have intentionally opened the door regarding the polygraph, Appellant further delved into the polygraph issue by asking five additional questions directed solely to the polygraph. Instead of immediately stopping the polygraph issue and moving to strike or for a mistrial, Appellant inquired further and developed Mr. Hollis' testimony regarding the polygraph. Further, Appellant waited to object and move for a mistrial until the close of his cross-examination, and when Appellee began re-directing on the issue. Not only is Appellant's motion for mistrial untimely, it is also invited error. Invited error prohibits a party from "tak[ing] advantage of an error which he himself invited or induced the trial court to make."Lester v. Leuck (1943), 142 Ohio St. 91, syllabus. See, also,Fostoria v. Ohio Patrolmen's Benevolent Assoc.,106 Ohio St.3d 194, 2005-Ohio-4558, at ¶ 12-13; Kayser v. Lorain Cty. Bd. ofElections (Aug. 7, 1996), 9th Dist. No. 95CA006308, at *2;State v. Brintzenhofe (May 12, 1999), 9th Dist. No. 18924, at *3; Akron v. Fowler, 9th Dist. No. 21327, 2003-Ohio-2844, at ¶ 9.
 {¶ 51} Appellant's decision to wait to move for a mistrial until after his further cross-examination about the polygraph is an error Appellant invited, and will not be corrected. Accordingly, we cannot find that the trial court abused its discretion in denying Appellant's motion for mistrial.
 {¶ 52} Appellant's fifth assignment of error is overruled.
 F. Sixth Assignment of Error
"THE STATE COMMITTED A BRADY AND KYLES VIOLATION WHEN IT FAILED TO DISCLOSE THE RESULTS OF THE LIE DETECTOR TEST ADMINISTERED TO DAVID HOLLIS[.]"
 {¶ 53} In his sixth assignment of error, Appellant alleges Appellee failed to disclose the existence and results of a polygraph of David Hollis, Appellee's primary eyewitness. Appellant contends Appellee's case would have been weaker and he could have controlled Mr. Hollis' testimony to prevent the polygraph information from being presented to the jury. It is Appellant's position that Appellee's failure to disclose the polygraph information are Brady and Kyles violations, which resulted in an unfair trial. We disagree.
 {¶ 54} A defendant has a constitutional right of access to evidence. State v. South, 9th Dist. No. 22289, 2005-Ohio-2152, at ¶ 10, citing State v. Benson, 152 Ohio App.3d 495,2003-Ohio-1944, at ¶ 10. In Brady v. Maryland (1963),373 U.S. 83, 87, the United States Supreme Court held that the prosecution's suppression of evidence that is favorable to the defendant violates his due process rights if the evidence is material to guilt or punishment, regardless of the prosecution's intentions. See, also, State v. Johnston (1988),39 Ohio St.3d 48, 60. Evidence is "material" if there is a "reasonable probability," that, had the prosecution disclosed the evidence, the result of the trial would have been different. United Statesv. Bagley (1985), 473 U.S. 667, 682. The United States Supreme Court has qualified this definition, stating that a "reasonable probability" of a different trial result is demonstrated by showing that the prosecution's suppression of the evidence "undermine[d] [the] confidence in the outcome of the trial."Kyles v. Whitley (1995), 514 U.S. 419, 434, citing Bagley,473 U.S. at 678; Johnston, 39 Ohio St.3d 48, paragraph five of the syllabus.
 {¶ 55} It is important to note, however, that a mere possibility that undisclosed evidence might have helped the defense or might have changed the trial outcome is insufficient to establish "materiality" under the Brady standard. UnitedStates v. Agurs (1976), 427 U.S. 97, 109-110, overruled in part on other grounds. A reversal is not warranted when a mere "combing of the prosecutors' files after the trial disclosed evidence possibly useful to the defense but not likely to have changed the verdict." Giglio v. United States (1972),405 U.S. 150, 154, quoting United States v. Keogh (C.A.2, 1968),391 F.2d 138, 148. Ultimately, the relevant question becomes whether in the absence of the evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434.
 {¶ 56} Both the United States Supreme Court and the Ohio Supreme Court have held that polygraph tests performed onwitnesses do not need to be disclosed or turned over during discovery. Wood v. Bartholomew (1995), 516 U.S. 1, 5; State v.Davis (1991), 62 Ohio St.3d 326, 342. See D'Ambrosio v.Bagley, No. 1:00CV2521, slip op. at *24 (N.D. Ohio Mar. 24 2006). This is due to the fact that polygraph results are highly unreliable and thus, do not fall within the category of scientific tests under Crim.R. 16. State v. Diaz (Mar. 12, 2003), 9th Dist. No. 02CA008069, 2003-Ohio-1132, ¶ 37. See, also,State v. Burhman (Sept. 12, 1997), 2d Dist. No. 96CA145, at *8.
 {¶ 57} In this case, the only polygraph administered was upon Mr. Hollis, Appellee's witness. Since polygraphs of witnesses are not discoverable, there are no Brady or Kyles violations for Appellee's failure to disclose Mr. Hollis' polygraph.
 {¶ 58} Appellant's sixth assignment of error is overruled.
 G. Seventh Assignment of Error
"THE TRIAL COURT, OVER OBJECTION OF THE APPELLANT, INSTRUCTED THE JURY ON FLIGHT IN VIOLATION OF THE DUE PROCESS CLAUSE OF THEFOURTEENTH AMENDMENT OF THE FEDERAL CONSTITUTION WHEN THERE WAS NOT SUFFICIENT EVIDENCE OF FLIGHT."
 {¶ 59} Appellant's seventh assignment of error alleges the trial court's jury instruction regarding flight was inappropriate because the record lacked sufficient evidence for the charge. Appellant contends the trial court's flight instruction was error warranting a new trial. We disagree.
 {¶ 60} The decision as to whether a particular jury instruction is sufficiently supported by evidence is reviewed for an abuse of discretion. State v. Wolons (1989),44 Ohio St.3d 64, paragraph two of the syllabus. A review of the record establishes that the flight instruction was properly supported by testimonial evidence. Mr. Hollis testified that after the events on January 29, 1991, he did not see Appellant the day after the shooting, the next week, the next month, or the next year, even though they were friends and hung out with the same crowd. Further, Detective Baker testified that he was assigned to do the follow-up investigation in 2002 in which they were still searching for Appellant. Detective Baker explained that Appellant was found in Massachusetts under the assumed name of Charles E. Williams. These facts were not contradicted during the trial and thus are sufficient to support a jury instruction regarding flight. See State v. Davilla, 9th Dist. No. 03CA008413,2004-Ohio-4448, at ¶ 15. Accordingly, we do not find that the trial court abused its discretion. Further, Appellant did not suffer any prejudice from the flight instruction, as Appellant was found not guilty on the detection specification (R.C.2929.04(A)(3)) under Count Three.
 {¶ 61} Appellant's seventh assignment of error is overruled.
 H. Eighth Assignment of Error
"THE TRIAL COURT COMMITTED PLAIN ERROR UNDER CRIM[.]R[.] 52 AND TRIAL COUNSEL WAS INEFFECTIVE UNDER THE FEDERAL CONSTITUTION WHEN THE ALTERNATE JURORS WERE ALLOWED TO BE IN THE JURY DELIBERATION ROOM WHILE THE JURY WAS DECIDING THE APPELLANT'S GUILT."
 {¶ 62} In his eighth assignment of error, Appellant alleges two errors. First, Appellant alleges that the trial court committed plain error in requiring the two alternate jurors to sit in on the deliberations during the guilt phase, but not to participate. Further, Appellant argues his trial counsel was ineffective as they did not object to the alternate jurors being present in the jury deliberations of the guilt phase. We disagree with both contentions.
1. Plain Error
 {¶ 63} The United States Supreme Court has held that it is error to permit alternate jurors to participate in jury deliberations; however, the error does not always necessarily rise to the level of plain error.[2] Olano,507 U.S. at 737. See, also, State v. Murphy (2001), 91 Ohio St.3d 516, 533. As discussed above, there is distinction between forfeiture and waiver in regards to preservation of issues for appeal and the application of plain error analysis. Id. at 733; McKee,91 Ohio St.3d at 299 fn. 3 (Cook, J., dissenting). Forfeiture occurs when no objection is made, while waiver requires the "intentional relinquishment or abandonment of a known right." Olano, at 733, quoting Zerbst, 304 U.S. at 464. Plain error analysis is only available in the instance of a forfeiture. McKee,91 Ohio St.3d at 299 fn.3 (Cook, J., dissenting).
 {¶ 64} In the instant case, Appellant's trial counsel initially objected by stating that "[they] would prefer not to have [the alternate jurors] in the jury room." However, trial counsel then changed their position and waived their earlier objection by stating "[they] think it is important that [the alternate] jurors sit in with the deliberation during the first portion of the trial." Trial counsel's subsequent statement is a waiver: it was an affirmation of Appellant's desire to intentionally relinquish his prior objection and agree to the alternate jurors being present in the jury room during deliberations. As this is a waiver in the true sense, Appellant has failed to preserve this issue for appeal and we are precluded from applying the Crim.R. 52(B) analysis.
2. Ineffective Assistance of Counsel
 {¶ 65} Additionally under the eighth assignment of error, Appellant alleges his trial counsel was ineffective as they failed to continue their objection, and eventually acquiesced, to the alternate jurors being present in deliberations. We disagree.
 {¶ 66} As explained above, trial counsel's decision to object, not to object (forfeiture) and/or to waive an objection are viewed as trial tactic and do not validate a claim of ineffective assistance of counsel. Gumm, 73 Ohio St.3d at 428;Downing at ¶ 23, citing Fisk at ¶ 9; Phillips,74 Ohio St.3d at 85. Trial counsel's strategic decisions are given great deference and will not be scrutinized by appellate courts.Carter, 72 Ohio St.3d at 558. Accordingly, Appellant failed to prove how his trial counsel were deficient, because their waiver of the objection regarding the alternate jurors is considered trial tactic. Further, Appellant failed to establish how he was prejudiced by having the alternate jurors present during the jury deliberations as there was no evidence of the alternate jurors disobeying the trial court's instruction or that their presence chilled deliberations. See Murphy, 91 Ohio St.3d at 540; Statev. Braden, 98 Ohio St.3d 354, 2003-Ohio-1325, at ¶ 52.
 {¶ 67} Appellant's charges do not rise to the level of ineffective assistance of counsel. See Strickland,466 U.S. at 687. The eighth assignment of error is overruled.
 I. Ninth Assignment of Error
"TRIAL COUNSEL WAS INEFFECTIVE UNDER THE FEDERAL CONSTITUTION WHEN THEY FAILED TO PRESENT AVAILABLE TESTIMONY THAT THE NAMED VICTIM IN THE APPELLANT'S CONVICTION WAS HIS STEP[-]BROTHER."
 {¶ 68} In his ninth assignment of error, Appellant alleges his trial counsel were ineffective as they failed to call Appellant's brother, Ronald Hairston, as a witness during the trial phase. In fact, trial counsel did not present any evidence or call any witnesses during the trial phase. Instead, trial counsel called Appellant's brother to testify during the mitigation phase only. Appellant claims his brother's testimony at the mitigation phase should have been presented at the trial phase because "it would have cast reasonable doubt on the state's case." We disagree.
 {¶ 69} As addressed above, tactical decisions by trial counsel cannot form the basis for a claim of ineffective assistance of counsel. See e.g., Windham at ¶ 24, quotingTaylor at ¶ 76; State v. Bradford, 9th Dist. No. 22441,2005-Ohio-5804, at ¶ 27; State v. Brown (1995),38 Ohio St.3d 305, 319. This Court has repeatedly held that "[d]ecisions regarding the calling of witnesses are within the purview of defense counsel's trial tactics." State v. Pordash, 9th Dist. No. 05CA008673, 2005-Ohio-4252, at ¶ 21, quoting State v.Ambrosio, 9th Dist. No. 03CA008387, 2004-Ohio-5552, at ¶ 10. Trial counsel's strategic decision to not pursue every possible angle is not ineffective assistance of counsel. Brown,38 Ohio St.3d at 319. Accordingly, trial counsel's failure to call Appellant's brother as a witness during the trial phase is a tactical decision. Thus, Appellant has failed to establish deficient counsel.
 {¶ 70} Additionally, Appellant's attempt to establish prejudice is nothing more than mere speculation that his brother's testimony would have created reasonable doubt. Speculation is insufficient to establish prejudice. Downing at ¶ 27, citing State v. Stalnaker, 9th Dist. No. 21731,2004-Ohio-1236, at ¶ 8-10.
 {¶ 71} Accordingly, Appellant's contention does not rise to the level of ineffective assistance of counsel. See Strickland,466 U.S. at 687. The ninth assignment of error is overruled.
 J. Tenth Assignment of Error
"THERE IS INSUFFICIENT EVIDENCE UNDER JACKSON V. VIRGINIA THAT THE HOMICIDE WAS DONE WITH `PRIOR CALCULATION AND DESIGN' RATHER THAN ONLY PURPOSELY AND THE WEIGHT OF THE EVIDENCE SUPPORTS ONLY A MURDER CONVICTION."
 Eleventh Assignment of Error
"THERE IS INSUFFICIENT EVIDENCE UNDER JACKSON V. VIRGINIA TO SUSTAIN THE HOMICIDE CONVICTION AND THE WEIGHT OF THE EVIDENCE SUPPORTS THE HOMICIDE CONVICTION." [sic]
 Twelfth Assignment of Error
"THERE IS INSUFFICIENT EVIDENCE UNDER JACKSON V. VIRGINIA TO SUSTAIN THE CAPITAL SPECIFICATION UNDER R.C. 2929[.]04(A)(8) AND THE WEIGHT OF THE EVIDENCE SUPPORT[S] THE CONVICTION FOR THE CAPITAL SPECIFICATION." [sic]
 {¶ 72} Appellant's tenth, eleventh, and twelfth assignments of error all allege that his conviction of aggravated murder, with a capital specification, was not supported by sufficient evidence and was against the manifest weight of the evidence. Further, Appellant alleges there was insufficient evidence and the weight of the evidence does not support prior calculation and design. We disagree with each of Appellant's contentions.
 {¶ 73} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. As a matter of appellate review, they involve different means and ends. See id. at 386-89. They also invoke different inquiries with different standards of review. Id.; State v. Smith (1997), 80 Ohio St.3d 89, 113. The difference, in the simplest sense, is that sufficiency tests the burden of production while manifest weight tests the burden of persuasion. Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring).
 {¶ 74} Sufficiency is a question of law. Thompkins,78 Ohio St.3d at 386; Smith, 80 Ohio St.3d at 113. If the State's evidence was insufficient as a matter of law, then on appeal, a majority of the panel may reverse the trial court. Thompkins,
78 Ohio St.3d at paragraph three of the syllabus, citing Sec.3(B)(3), Art. IV, Ohio Constitution. Because reversal for insufficiency is effectively an acquittal, retrial is prohibited by double jeopardy. Thompkins, 78 Ohio St.3d at 387, citingTibbs v. Florida (1982), 457 U.S. 31, 47. Under this construct, the State has failed its burden of production, and as a matter of due process, the issue should not even have been presented to the jury. Thompkins, 78 Ohio St.3d at 386; Smith,80 Ohio St.3d at 113.
 {¶ 75} In a sufficiency analysis, an appellate court presumes that the State's evidence is true (i.e., both believable and believed), but questions whether the evidence produced satisfies each of the elements of the crime. Thompkins,78 Ohio St.3d at 390 (Cook, J., concurring). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt."State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, citing Jackson v. Virginia (1979), 443 U.S. 307, 319. This standard requires no exhaustive review of the record, no comparative weighing of competing evidence, and no speculation as to the credibility of any witnesses. Instead, the appellate court "view[s] the evidence in a light most favorable to the prosecution." Id. "[T]he weight to be given the evidence and the credibility of witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 76} Manifest weight is a question of fact. Thompkins,78 Ohio St.3d at 387. If the trial court's judgment was against the manifest weight of the evidence, then an appellate panel may reverse the trial court. Id. In the special case of a jury verdict, however, the panel must be unanimous in order to reverse. Id. at paragraph four of the syllabus, citing Sec.3(B)(3), Art. IV, Ohio Constitution. Because reversal on manifest weight grounds is not a question of law, it is not an acquittal but instead is akin to a deadlocked jury from which retrial is allowed. Id. at 388, citing Tibbs, 457 U.S. at 42. Under this construct, the appellate panel "sits as [the] `thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony," finding that the State has failed its burden of persuasion. Id.
 {¶ 77} When a defendant asserts his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
"A court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial."Thompkins, 78 Ohio St.3d at 390 (Cook, J., concurring). This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Otten, 33 Ohio App.3d at 340.
 {¶ 78} In application, this may be stated as a "[c]ourt will not overturn a judgment based solely on the fact that the jury preferred one version of the testimony over the other." State v.Lee, 158 Ohio App.3d 129, 2004-Ohio-3946, ¶ 15, quoting Statev. Hall (Sept. 20, 2000), 9th Dist. No. 19940, at *5. Nor is a conviction "against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact."State v. Urbin, 148 Ohio App.3d 293, 2002-Ohio-3410, ¶ 26, quoting State v. Haydon (Dec. 22, 1999), 9th Dist. No. 19094, at *7. Moreover, a conviction may withstand evidence that is susceptible to some plausible theory of innocence. State v.Figueroa, 9th Dist. No. 22208, 2005-Ohio-1132, at ¶ 7, citingJenks, 61 Ohio St.3d at 273.
 {¶ 79} Finally, although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction was supported by the manifest weight of the evidence necessarily includes a finding of sufficiency. State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462, at *2. "Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." Lee at ¶ 18, citing Cuyahoga Falls v. Scupholm (Dec. 13, 2000), 9th Dist. Nos. 19734 and 19735, at *3. Accord Urbin at ¶ 31. In the present case, manifest weight is dispositive on each of Appellant's assignments of error.
1. Prior Calculation and Design
 {¶ 80} In 1974, the General Assembly reclassified first-degree murder as aggravated murder and added the more stringent element, "prior calculation and design." State v.Cotton (1978), 56 Ohio St.2d 8, 10-11; R.C. 2903.01(A). "[T]he phrase `prior calculation and design' * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." State v. Taylor
(1997), 78 Ohio St.3d 15, 19. "Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation." Taylor v. Mitchell (N.D. Ohio 2003), 296 F.Supp. 2d 784, 820. While a few fleeting moments of deliberation or instantaneous deliberations are inadequate to support prior calculation and design, "a prolonged period of deliberation is [also] unnecessary." Mitchell,296 F.Supp. 2d at 821, quoting State v. Quinones (Oct. 14, 1982), 8th Dist. No. 44463, at *11; Cotton, 56 Ohio St.2d 8, at paragraph two of the syllabus. However, the Ohio Supreme Court has not developed a bright-line test for finding prior calculation and design. Statev. Jones (2001), 91 Ohio St.3d 335, 345.
 {¶ 81} Instead, the existence of prior calculation and design is determined on a case-by-case analysis of the facts and evidence. Jones, 91 Ohio St.3d at 345. In State v. Jenkins
(1976), 48 Ohio App.2d 99, 102, the Eighth District Court of Appeals set out three factors to consider in determining the applicability of prior calculation and design: 1) whether the accused and victim knew each other, and if so, was that relationship strained; 2) whether the accused gave thought or preparation to choosing the murder weapon or murder site; and 3) whether the killing was drawn out or an instantaneous eruption of events.
 {¶ 82} Due to the lack of a bright-line test for prior calculation and design, Ohio courts have expanded the factors to include: 1) "whether the defendant at any time expressed an intent to kill"; 2) whether "there was a break or interruption in the encounter, giving time for reflection"; 3) "whether the defendant displayed a weapon from the outset"; 4) "whether the defendant retrieved a weapon during the encounter"; 5) "the extent to which the defendant pursued the victim"; and 6) "the number of shots fired." Mitchell, 296 F.Supp. 2d at 821-22. All of these factors need to be weighed in concert with the totality of the circumstances surrounding the murder. Jenkins,48 Ohio App.2d at 102.
 {¶ 83} At the trial and in his brief, Appellant argues that the killing of Mr. Newson occurred instantaneously in relation to the killing of Mr. Movrin, thus there was no prior calculation or design by Appellant. This position is directly opposed to Appellee's position, supported by testimony, that Mr. Newson's murder was not instantaneous and involved prior calculation and design. Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State regarding prior calculation and design.
 {¶ 84} Mr. Hollis was with Appellant at the time of the murders in this case, and in fact pled guilty to the murder of Mr. Movrin. As part of his plea, Mr. Hollis agreed to testify against Appellant regarding the events surrounding January 29, 1991. According to Mr. Hollis' testimony, after shooting Mr. Movrin, Appellant, Mr. Hollis and Mr. Newson exited the backseat of the car. Mr. Newson fled from the car to the street corner, while Mr. Hollis and Appellant stood outside the car discussing whether or not to kill Mr. Dawson, the driver of the car. During this exchange, Appellant took the gun from Mr. Hollis. Mr. Hollis was able to persuade Appellant not to kill Mr. Dawson, as the killing of Mr. Movrin was an accident and Mr. Dawson did not turn around and get a look at them.
 {¶ 85} While they were still standing by the car, Appellant then told Mr. Hollis that they had to kill Mr. Newson, their friend. Mr. Hollis again tried to convince Appellant that it was not necessary to kill Mr. Newson. They discussed it "back and forth about two or three times." Appellant told Mr. Hollis to call Mr. Newson, who was still standing on the corner, over to them. Mr. Newson approached Appellant and Mr. Hollis, and the three of them began to walk towards the back of an apartment building. Mr. Hollis was walking a few feet in front of Appellant and Mr. Newson when he heard Appellant tell Mr. Newson "you know I love you, man" and then a gunshot. Mr. Hollis turned to see Mr. Newson fall to the ground. Appellant testified that the gun used to kill Mr. Newson was a .38 caliber revolver that required a "pretty strong pull on [the] trigger to make the gun fire."
 {¶ 86} Ms. Wilson, another State's witness, testified that from her apartment window, she saw Appellant shoot Mr. Newson. Appellant and Mr. Newson were behind the apartment building when Appellant turned toward Mr. Newson, raised his gun, and shot Mr. Newson in the head.
 {¶ 87} Further, the county coroner testified that upon his inspection of Mr. Newson's body, he found stippling around the gunshot wound. Stippling is indicative of a "close gunshot wound." However, the coroner was unable to verify the exact distance between the gun and Mr. Newson.
 {¶ 88} Based upon the transcript, there was evidence that Appellant told Mr. Hollis of his intent to kill Mr. Newson, Appellant retrieved the gun from Mr. Hollis in order to shoot Mr. Newson, and Appellant pursued Mr. Newson by calling him over and then shooting him. Further, the record demonstrates that the killing of Mr. Newson was not instantaneous and that there were more than a few moments between Mr. Movrin and Mr. Newson's deaths. Appellant and Mr. Hollis got out of the car and stood there while they first debated whether to kill Mr. Dawson. Then, Appellant and Mr. Hollis discussed two or three times whether or not to kill Mr. Newson. Appellant then called Mr. Newson over and walked with him before he raised his weapon and shot him. Appellant clearly had time to reflect on his decision to kill Mr. Newson.
 {¶ 89} The facts supporting prior calculation and design in this case are similar to the facts in State v. Goodwin (1999),84 Ohio St.3d 331. In Goodwin, the defendant fatally shot a store owner while robbing the store. Id. at 331. The Ohio Supreme Court found that there was sufficient evidence to find prior calculation and design due to the fact that the defendant placed his gun to the forehead of a cooperative and unresisting victim. Id. at 344. This action required thought on the defendant's part to place the gun at the victim's forehead and additional time to pull the trigger, thus the killing was not spur-of-the-moment. Id. Similarly, Mr. Newson was not resisting or fleeing from Appellant. Instead, they were walking next to each other when Appellant stopped, turned toward Mr. Newson, raised his weapon to Mr. Newson's face, and pulled the tight trigger. A review of the totality of the circumstances, establishes that Appellant had sufficient time and reflection and engaged in acts rising to the level of prior calculation and design.
 {¶ 90} Based on our review of the entire record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. Thompkins, 78 Ohio St.3d at 387. Rather, we find it reasonable that the jury believed the State's version of the events, disbelieved Appellant and convicted him accordingly. See Lee at ¶ 15, quoting Hall, at *5. We conclude that the conviction is not against the manifest weight of the evidence.
 {¶ 91} Having found that Appellant's conviction was not against the manifest weight of the evidence, we also conclude that there was sufficient evidence to support the jury's verdict in this case with respect to the offense. See Roberts, supra.
 {¶ 92} Appellant's tenth assignment of error is overruled.
2. Aggravated Murder
 {¶ 93} Appellant was convicted of aggravated murder, in violation of R.C. 2903.01(A), which states, "No person shall purposely, and with prior calculation and design, cause the death of another." Appellant challenges the evidence presented by Mr. Hollis and Ms. Wilson. Appellant argues these witnesses lack credibility as they gave inconsistent statements during the ten year investigation. Additionally, Appellant questions Mr. Hollis' credibility based on his criminal background. Further, Appellant points to the lack of physical and/or scientific evidence in support of the aggravated murder conviction being against the manifest weight.
 {¶ 94} Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State regarding aggravated murder. The jury heard testimony from the State's eight witnesses: three eyewitnesses, a coroner, and four police officers/detectives. However, the defense did not present any witnesses or evidence during the trial phase.
 {¶ 95} Mr. Hollis was the State's primary witness as he was present during Mr. Newson's shooting. As discussed above, Mr. Hollis testified as to the sequence of events and discussions following his shooting of Mr. Movrin to Appellant's shooting of Mr. Newson. As we concluded above, the record substantiates a finding of prior calculation and design. While Mr. Hollis did not directly see Appellant shoot Mr. Newson, he heard the gunshot, he saw the gun in Appellant's hand and then he saw Mr. Newson fall to the ground after the gun was fired. The coroner determined Mr. Newson's cause of death to be a gunshot wound to the head.
 {¶ 96} Ms. Wilson also testified that from her front bedroom window she witnessed Appellant, Mr. Hollis and Mr. Newson exit the car. Ms. Wilson then went to a bedroom in the rear of her apartment, where she watched the three men walk behind an apartment building. There she saw Appellant turn, raise his gun, and shoot Mr. Newson in the face.
 {¶ 97} At trial, the appellant argued that the State's evidence, particularly Mr. Hollis' and Ms. Wilson's testimony, was inconsistent and simply not worthy of belief. While Appellant pointed out Mr. Hollis' and Ms. Wilson's inconsistencies between their prior statements and their trial testimony, this is a matter for the jury to weigh the witnesses' credibility. Mr. Hollis explained that his prior statements were not in fact statements, but hypotheticals; thus, preventing the statements from being used against him. Appellant portrayed Mr. Hollis' statements as a game of cat and mouse. Appellant also attempted to discredit Mr. Hollis' testimony by pointing out that Mr. Hollis had a lengthy history of committing felony robberies and would talk to the police whenever he wanted to make a deal for leniency. Tactically, Appellant's attempts to attack the credibility of the State's witnesses appear ineffective.
 {¶ 98} In his appellate brief, the appellant offers no alternative explanation or cogent theory to reconcile the State's testimony regarding the aggravated murder of Mr. Newson by Appellant. Instead, he merely insists that the State's evidence is unbelievable because of Mr. Hollis' and Ms. Wilson's inconsistent statements during the investigation and Mr. Hollis' criminal background. This was a point worth arguing to the jury, and the jurors were obligated to assess the evidence critically, under the strict beyond a reasonable doubt standard. However, on appeal, this Court assesses the evidence liberally, considering whether "the evidence weighs [so] heavily against the conviction" that the necessary conclusion is that "the jury clearly lost its way and created * * * a manifest miscarriage of justice."Thompkins, 78 Ohio St.3d at 387.
 {¶ 99} The jury in this case had the opportunity to view the witnesses and adjudge their credibility and was entitled to believe the witnesses' testimony. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Therefore, we must give deference to the jurors' judgment, as matters of credibility are primarily for the trier of fact. See State v.Lawrence (Dec. 1, 1999), 9th Dist. No. 98CA007118, at *6.
 {¶ 100} Based on our thorough review of the entire record, we conclude that Appellant's criticisms of the State's evidence in this case are inadequate to prove that the jury lost its way and created a manifest miscarriage of justice. Thompkins,78 Ohio St.3d at 387. Accordingly, we find that Appellant's conviction for aggravated murder was not against the manifest weight of the evidence.
 {¶ 101} Further, having found that Appellant's conviction was not against the manifest weight of the evidence, we also conclude that there was sufficient evidence to support the jury's verdict in this case with respect to aggravated murder. See Roberts,
supra.
 {¶ 102} Appellant's eleventh assignment of error is overruled.
3. Capital Specification R.C. 2929.04(A)(8)
 {¶ 103} In addition to aggravated murder, Appellant was also convicted of a related witness specification violation under R.C.2929.04(A)(8), which carries the death penalty. R.C.2929.04(A)(8) states,
"(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to 2941.14 of the Revised Code and proved beyond a reasonable doubt:
* * *
"(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for his testimony in any criminal proceeding."
 {¶ 104} Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State regarding the witness specification.
 {¶ 105} Mr. Hollis testified that he and Appellant had a discussion outside of the car regarding whether or not it was necessary to kill Mr. Newson. Mr. Hollis tried, unsuccessfully, to dissuade Appellant by pointing out that Mr. Newson grew up with them in the neighborhood and that he was cool and would not say anything to anyone. However, Appellant felt it was necessary to kill Mr. Newson because he had witnessed the murder of Mr. Movrin. Appellant believed Mr. Newson could, and would, identify Appellant and Mr. Hollis as being involved in Mr. Movrin's death.
 {¶ 106} Appellant and Mr. Hollis' discussion regarding whether or not to kill Mr. Newson occurred outside the car, after the shooting of Mr. Movrin. The commission of the first crime, Mr. Movrin's murder, was complete. Thus, Mr. Newson's murder was not during the commission of Mr. Movrin's murder.
 {¶ 107} While Appellant and Mr. Hollis were talking by the car, Mr. Newson was standing away from them on a street corner. After their discussion, Mr. Hollis, at Appellant's instruction, called Mr. Newson over to them. The three men joined together and walked behind an apartment building. It is there that Appellant shot Mr. Newson. The three men joined together from different locations and were walking. Accordingly, each of the men's actions between Mr. Movrin's murder and Mr. Newson's murder is not indicative of fleeing from the original murder scene.
 {¶ 108} At the trial and in his brief, Appellant argues that the killing of Mr. Newson occurred during the commission, attempted commission or flight immediately after the offense Mr. Newson witnessed and thus the witness specification is not applicable. This position contradicts the trial testimony that Mr. Newson's death occurred as a separate crime and not during the flight from Mr. Movrin's murder.
 {¶ 109} Based on our review of the entire record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. Thompkins, 78 Ohio St.3d at 387. Rather, we find it reasonable that the jury believed the State's version of the events, disbelieved Appellant and convicted him accordingly. See Lee at ¶ 15, quoting Hall, at *5. We conclude that the conviction is not against the manifest weight of the evidence.
 {¶ 110} Having found that Appellant's conviction was not against the manifest weight of the evidence, we also conclude that there was sufficient evidence to support the jury's verdict in this case with respect to the witness specification of R.C.2929.04(A)(8). See Roberts, supra.
 {¶ 111} Appellant's twelfth assignment of error is overruled.
 K. Thirteenth Assignment of Error
"THE TRIAL COURT ERRED IN ORDERING THE APPELLANT TO PAY THE MEDICAL AND FUNERAL EXPENSES OF THE VICTIM[.]"
 {¶ 112} Appellant's thirteenth assignment of error contests the trial court's imposition of restitution for medical and funeral bills for the victim, Mr. Newson. Appellant argues the restitution order should be vacated as the trial court was not permitted to order restitution without documentary or testimonial evidence substantiating the amount of restitution.
 {¶ 113} Appellee concedes that the restitution order should be vacated, but for different reasons. Appellee points out that the law in 1991 did not permit the trial court to impose restitution for medical and funeral bills in a conviction of aggravated murder.
 {¶ 114} Upon review, we do not find any statutes in existence in 1991 that permitted an order of restitution in an aggravated murder conviction. As both parties agree that the restitution order should be vacated, Appellant's thirteenth assignment of error is sustained.
 L. Fourteenth Assignment of Error
"THE CUMULATIVE ERRORS DEPRIVED THE APPELLANT OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE FEDERAL CONSTITUTION."
 {¶ 115} In his fourteenth assignment of error, Appellant alleges that all the errors in this case, even if harmless, must not be reviewed in isolation, but together. Appellant concludes by claiming that the cumulative effect of all the alleged errors has deprived him of a fair trial and sentencing hearing. We disagree.
 {¶ 116} Upon our review of the record and all of Appellant's assignment of errors, we find that there were not multiple errors and Appellant received a fair trial. See State v. Bryan,101 Ohio St.3d 272, 2004-Ohio-971, at ¶ 211; State v. Brinkley,105 Ohio St.3d 231, 2005-Ohio-1507, at ¶ 158. "[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." State v. Hill (1996),75 Ohio St.3d 195, 212, quoting United States v. Hasting (1983),461 U.S. 499, 508-9. Moreover, "errors cannot become prejudicial by sheer weight of numbers." (Internal quotations omitted.) Hill,75 Ohio St.3d at 212.
 {¶ 117} Appellant's fourteenth assignment of error is overruled.
 III. {¶ 118} Appellant's assignments of error one through twelve and fourteen are overruled. Appellant's thirteenth assignment of error is sustained. The judgment of Lorain County Court of Common Pleas is affirmed in part and vacated in part. The trial court's restitution order is vacated, and the remainder of Appellant's sentence remains undisturbed.
Judgment affirmed in part, and vacated in part.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed equally to both parties.
Whitmore, P.J. Concurs.
Carr, J. Concurs in judgment only.
[1] Thirty years for Count Two and Specification Two and an additional mandatory three years for the firearm specification on Count Two. There was no sentence on Count Three as it merged into Count Two.
[2] We note that R.C. 2313.37 and Crim.R. 24(G)(1) require alternate jurors to be discharged once the case is submitted to the jury for deliberations. Thus, it is clearly an error to not discharge the alternates and instead require them to sit in on the deliberations, but not participate. Murphy,91 Ohio St.3d at 531.
However, in capital cases, alternate jurors are not to be discharged until after the jury retires to deliberate regarding the penalty phase. Crim.R. 24(G)(2). Accordingly, an alternate juror may not be present nor participate in the deliberations for the guilt phase. Murphy, 91 Ohio St.3d at 532. Instead, the trial court should retain the alternate jurors and continue to instruct them with the same rules and admonitions until such time as they are discharged. State v. Reiner (2000),89 Ohio St.3d 342, 351. Thus, it is error to have the alternate jurors present and not participating in the guilt phase. See Murphy, supra. However, based upon our discussion below, we are unable to address this error by the trial court.