THE STATE OF OHIO, APPELLANT, v. HATFIELD, APPELLEE.

[Cite as *State v. Hatfield,* 121 Ohio St.3d 1201, 2009-Ohio-353.]

(No. 2008–0045—Submitted December 16, 2008—Decided February 5, 2009.)

{¶ 1} The cause is dismissed, sua sponte, as having been improvidently accepted.

PFEIFER, LUNDBERG STRATTON, LANZINGER, and CUPP, JJ., concur.

MOYER, C.J., and O'CONNOR and O'DONNELL, JJ., dissent.

**O'CONNOR, J., dissenting.**

{¶ 2} I disagree strongly with the court's decision to dismiss this appeal as having been improvidently accepted.

{¶ 3} I believe that the jury's prerogative to decide matters fairly, using the evidence admitted by the court and common knowledge garnered outside the courtroom, should be respected. Because there was sufficient, probative evidence from which the jurors could find that Sonny Hatfield acted recklessly by operating a motor vehicle while under the influence of cocaine, I would reverse the decision of the court of appeals and reinstate Hatfield's conviction for aggravated vehicular homicide.

I

{¶ 4} At approximately 5:35 p.m. on February 24, 2004, vehicles driven by appellee, Sonny Hatfield, and Sharon Kingston collided at an intersection in Plymouth Township. Kingston died at the scene due to injuries she sustained in the accident. Hatfield was more fortunate, suffering only minor injuries.

{¶ 5} At the time of the accident, the roadways were dry, and there were no adverse weather conditions. The State Highway Patrol trooper who questioned Hatfield after the accident testified that Hatfield admitted that he had failed to stop at a stop sign before proceeding into the intersection where he struck Kingston's car on the front left side. In fact, Hatfield did not remember that there was a stop sign at the intersection. The trooper further testified that Hatfield admitted knowing that his driver's license was suspended and that his vehicle was not insured.

{¶ 6} Hatfield further told police that he uses marijuana daily, that he consumes alcohol four to five times a week, and that he uses cocaine "a few times a week." Hatfield also admitted to police that he had been at a party until 6:00 a.m. that day and that at the party, he had consumed one-half ounce of marijuana, seven to nine "lines" of cocaine, and eight to nine mixed drinks. He stated that he had slept from about 6:30 that morning until about 2:00 p.m. Hatfield denied having used alcohol or drugs in the interval between leaving the party and the accident, and he denied having used alcohol or drugs in the time between the accident and his interview with the police.

{¶ 7} Hatfield initially refused to provide a blood sample at the hospital. Eventually, however, he agreed. Two samples of his blood were taken at the hospital. The first was collected at 9:29 p.m., approximately four hours after the accident. The second was taken at 10:06 p.m., four and one-half hours after the accident.

{¶ 8} According to the undisputed evidence at trial, the first blood sample showed the presence of cocaine at a level of 171.34 nanograms per milliliter, and benzoylecgonine, a metabolite of cocaine, at a level of 464.13 nanograms per milliliter. The second sample showed no cocaine in the bloodstream but that benzoylecgonine was present at a level of 451.61 nanograms per milliliter. The amounts of cocaine and benzoylecgonine found in Hatfield's blood are far in excess of the 50 nanograms per milliliter levels proscribed by the legislature for operating a motor vehicle. See R.C. 4511.19.

{¶ 9} Hatfield was indicted on one count of vehicular homicide, R.C. 2903.06(A)(3)(a), a fourth-degree felony that requires proof of negligence, and one count of aggravated vehicular homicide, R.C. 2903.06(A)(2)(a), a second-degree felony that requires proof of recklessness. The jury returned guilty verdicts on both counts. A divided court of appeals, however, reversed the convictions and remanded the cause for a new trial.

{¶ 10} The appellate court acknowledged that the evidence of the cocaine use, including the results of the blood tests, was relevant to the issue of recklessness. However, the court also held that the state did not connect that evidence to Hatfield's state of mind at the time of the accident and that the average juror does not possess the knowledge to formulate a reliable opinion regarding the lasting effects of cocaine on a user's body. Therefore, the court of appeals held, a reasonable jury could not conclude beyond a reasonable doubt that Hatfield had been under the influence of cocaine at the time of the accident, and the court reversed his convictions.

{¶ 11} Admittedly, the state did not present expert or other evidence concerning whether or how the amount of cocaine in Hatfield's blood affected his

perceptions or impaired his driving ability. That evidence may have been helpful, but it was not necessary to sustain the convictions.

## II

{¶ 12} For more than 50 years, courts have stated that because the effects of alcohol consumption on a person's ability to accurately observe one's environment are a matter of common knowledge and experience, jurors may, without the aid of expert testimony, use the fact of alcohol consumption as a basis from which to infer the impairment of a person's ability to observe and recall accurately. See, e.g., *State v. Heinz* (1984), 3 Conn.App. 80, 86, 485 A.2d 1321, citing *D'Amato v. Johnston* (1953), 140 Conn. 54, 58, 97 A.2d 893. I believe that jurors are equally capable of making similar inferences when faced with a defendant's use of drugs such as cocaine, and that the law permits them to do so.

{¶ 13} We are inundated daily with information about drugs and drug abuse. We live in a society in which the effects of recreational drugs such as cocaine are taught to students at an early age as part of formal curricula and in which the effects of such drugs also permeate our local and national news, as well as our common forms of entertainment, including movies[1] and television programs.

{¶ 14} Many courts from around the country recognize that the public is well aware of the effects of using drugs such as cocaine. Although average jurors may not know the specific biological processes used by the body to metabolize a drug like cocaine, they undoubtedly share a common knowledge about such drugs. Courts have found that jurors recognize that drugs such as cocaine are absorbed by the body. See, e.g., *State v. Strong* (Iowa 1992), 493 N.W.2d 834, 837 (noting that it is "common knowledge" that the human body absorbs and eliminates substances like alcohol and cocaine). Jurors also recognize that cocaine alters a person's perceptions and abilities. See *State v. McClendon* (1999), 248 Conn. 572, 597, 730 A.2d 1107, fn. 5 ("Even without expert testimony, a jury is likely to view with skepticism an identification made by a witness under the influence of cocaine, because it is *common knowledge* that use of narcotics impairs perception" [emphasis added]). And jurors know that cocaine is highly addictive and can cause physical harm and death to its users. *In re Lock* (Tex.2001), 54 S.W.3d 305, 320 ("It is *common knowledge* that [cocaine] is highly addictive and potentially fatal" [emphasis added]). Cf. *Torres v. State* (Tex.App. 1988), 754 S.W.2d 397, 401 (prosecutor's statements in closing arguments, including "We all know what cocaine does" and "A lot of people are dying," were proper because that "information may easily be classified as *common knowledge*" [emphasis added]).

---

1. The Academy Award-winning movie, "Traffic," in which an affluent Ohio family headed by a fictional justice of this court struggles with a daughter's cocaine use, is one such example.

{¶ 15} I believe that the following statements by the Supreme Court of Connecticut regarding marijuana are equally applicable to cocaine: "[B]ecause [marijuana] is an illegal substance, it may be that many jurors may have no firsthand knowledge regarding the effects of marijuana on one's ability to perceive and to relate events. At the same time, we cannot blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or friends. The ability to draw inferences about the impairing effects of marijuana, like alcohol, however, is based upon common knowledge, experience and common sense, not necessarily on personal experience." *State v. Clark* (2002), 260 Conn. 813, 824, 801 A.2d 718.

{¶ 16} In this day and age, it is no more remarkable to find that jurors understand the effects of using drugs like marijuana and cocaine than it is to find that they understand the effects of alcohol consumption. Because of that common knowledge, I would hold that in any criminal cases in which a defendant's state of mind is at issue, including this aggravated-vehicular-homicide case, courts should admit reliable evidence of drug use as evidence that the defendant's perceptions may have been impaired while the drug was in his body, even if expert testimony on that fact is not admitted.

{¶ 17} A jury, of course, is not required to find that the use of drugs necessarily affected the defendant's ability to accurately perceive events. Accordingly, the parties may wish to present expert evidence that supports that conclusion.

{¶ 18} But jurors should also be permitted to reach that conclusion based on their own common knowledge, even in the absence of expert testimony. To hold otherwise is, essentially, to hold that the jury must ignore what it already knows simply because an expert did not confirm it. That conclusion is absurd. An expert opinion will not assist a jury in deciding a matter of common knowledge, education, and experience.

### III

{¶ 19} The key question in this appeal is the propriety of Hatfield's conviction for aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a).[2] To

---

2. Before holding that this case had been improvidently accepted, this court agreed to review additional propositions of law in this appeal, including those related to the propriety of admitting evidence of Hatfield's prior license suspensions, see *Old Chief v. United States* (1997), 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574, and the proper remedy when a defendant is convicted of and

succeed in its prosecution for that offense, the state was required to establish that Hatfield caused Kingston's death by acting recklessly. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result * * *." [3] R.C. 2901.22(C).

{¶ 20} As the dissenting judge on the court of appeals observed, because Hatfield was not convicted of aggravated vehicular homicide based on an operating-under-the-influence offense, there was no requirement that the state prove a causal nexus between his use of drugs earlier in the day and his state of mind at the time of the accident. Rather, the salient inquiry for the jury was whether the state established that Hatfield was reckless in operating his motor vehicle.

{¶ 21} In order to establish its case, the state was entitled to use circumstantial evidence. Here, there was ample circumstantial evidence upon which the jury could have based its finding that Hatfield acted recklessly.

{¶ 22} Based on the jurors' own knowledge and common sense, they could conclude that people use drugs to alter their perceptions. With that knowledge in mind, the jury heard uncontroverted evidence that Hatfield had used large amounts of cocaine, marijuana, and alcohol on the day of the accident. The jury also heard undisputed evidence that Hatfield's blood contained levels of cocaine and cocaine metabolites several hours after the accident. Because Hatfield denied using any drugs between the time of the accident and the blood draws, a jury could deduce that he must have had cocaine in his system at the time of the accident. A jury could also conclude that Hatfield's perceptions had been altered by those drugs at the time of the accident.

{¶ 23} Given Hatfield's chronic drug use, a jury could find that Hatfield knew that drugs affected him and that he chose to operate a vehicle with an altered sense of reality and distorted perceptions. And given that he initially declined to provide blood samples after the accident, a jury could also conclude that Hatfield knew that his blood would contain evidence that he was impaired.

{¶ 24} Given the foregoing conclusions, it required no great leap of logic to find that Hatfield had acted recklessly by operating a motor vehicle while he was under the influence of cocaine. See, e.g., *State v. McKnight* (2003), 352 S.C. 635, 645–646, 576 S.E.2d 168 ("Here, it is undisputed that McKnight took cocaine on numerous occasions while she was pregnant, that the urine sample taken immediately after she gave birth had very high concentrations of cocaine, and that the

---

sentenced for committing allied offenses of similar import. I do not offer any opinion on those propositions.

3. The trial judge instructed the jury on the standard legal definition of recklessness, and there is no suggestion that the instruction was inadequate.

baby had benzoylecgonine in its system. * * * Given the fact that it is public knowledge that usage of cocaine is potentially fatal, we find the fact that McKnight took cocaine knowing she was pregnant was sufficient evidence to submit to the jury on whether she acted with extreme indifference to her child's life"). Cf. *Gerdes v. John Hancock Mut. Life Ins. Co.* (C.D.Ill.2001), 199 F.Supp.2d 861, 866 ("No one disputes that [decedent] took the 'speedball' for pleasurable effects. However, with the widespread dissemination of drug information and the high general public perception of the danger of using drugs such as heroin and cocaine, Plaintiffs cannot reasonably assert that [decedent] did not know that his ingestion of heroin, cocaine, and ethanol could cause serious injury and possible death. [Decedent] had to be aware of the risk involved and assumed that risk"). In fact, such a conclusion is supported amply by the facts of this case, which fully establish that Hatfield, acting with free will, chose to operate a motor vehicle within hours of using large amounts of alcohol and drugs.

{¶ 25} The jury's verdict is also consistent with sound public policy. Ohio lawmakers recognize the dangers posed by cocaine and have therefore enacted extensive laws criminalizing its use.[4] For example, R.C. 4511.19(A)(1)(j)(ii) and (iii) provide that "[n]o person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply: * * * The person has * * * a concentration of cocaine in the person's whole blood or blood serum or plasma of at least fifty nanograms of cocaine per milliliter of the person's whole blood or blood serum or plasma [or the] person * * * has a concentration of cocaine metabolite in the person's whole blood or blood serum or plasma of at least fifty nanograms of cocaine metabolite per milliliter of the person's whole blood or blood serum or plasma."

{¶ 26} The statute embodies the General Assembly's policy determination that it is dangerous, and therefore illegal, to operate a vehicle with a concentration of more than 50 nanograms of cocaine or cocaine metabolites per milliliter of blood. Nothing in that statute or our case law supports the appellate court's conclusion that the state must also, independent of the blood evidence, establish that a driver who violates the statute by having more than 50 nanograms of cocaine or cocaine metabolites in a milliliter of his blood while operating a vehicle was impaired at the time of the accident. Not surprisingly then, the court of appeals' opinion in this case cites not a single authority for its erroneous conclusion that a reasonable jury could not conclude that Hatfield had acted recklessly when he drove his car while under the influence of cocaine.

---

4. Congress recognizes that controlled substances like cocaine have a "substantial and detrimental effect on the health and general welfare of the American people." Section 801(2), Title 21, U.S.Code. Its possession, distribution, and use are thus extensively regulated and proscribed by federal authorities.

{¶ 27} "A licensed driver is charged with knowledge that driving while under the influence is against the law, and creates a substantial risk to himself and others." *State v. Hennessee* (1984), 13 Ohio App.3d 436, 439, 13 OBR 525, 469 N.E.2d 947. Because I believe that the evidence is sufficient to establish that Hatfield was aware of the risks of operating his vehicle while having cocaine in his body and because I conclude that such conduct constitutes recklessness, I dissent and would reverse the judgment of the court of appeals.

MOYER, C.J., and O'DONNELL, J., concur in the foregoing opinion.

---

Thomas L. Sartini, Ashtabula County Prosecuting Attorney, and Shelley M. Pratt, Assistant Prosecuting Attorney, for appellant.

Ashtabula County Public Defender, Inc., and Joseph A. Humpolick, for appellee.

Dennis P. Will, Lorain County Prosecuting Attorney, and Billie Jo Belcher, Assistant Prosecuting Attorney, urging reversal for amicus curiae, Ohio Prosecuting Attorneys Association.