[Cite as *State v. Jones*, 2012-Ohio-4256.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.     25986 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOHN WILBERT JONES | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.     CR 10 10 2725 |

DECISION AND JOURNAL ENTRY

Dated: September 19, 2012

CARR, Judge.

{¶1}   Appellant, John Jones, appeals his convictions for murder and endangering children.  This Court affirms.

I.

{¶2}   Five-month-old Jada Ruiz Jones stopped breathing sometime before 10:00 a.m. on the morning of March 19, 2010.  The first responders did not notice any external injuries, so they began resuscitation attempts and transported Jada to the emergency room under the impression that she may have been a victim of sudden infant death.  Their attempts to revive Jada were successful, but after initial test results came back in the emergency room, the full extent of Jada's condition became apparent.  Further testing confirmed that she had suffered one acute subdural hematoma, in addition to a previous one that was in the healing process, bleeding behind both eyes, numerous broken bones, and massive soft tissue bruising in the lumbar region of her spine.  After other possible causes of her injuries had been ruled out, doctors concluded that she had

been shaken with enough force to cause her airway to be cut off, leading to cardiac and respiratory arrest. Although Jada's heart was beating, her doctors concluded that she had suffered damage to her brain from lack of oxygen and blood flow such that her brain was dying. Within twenty-four hours, they informed her family that she had no chance of recovery. Nonetheless, Jada remained on life support for four months. She died in her mother's arms on July 17, 2010, after life support was withdrawn.

{¶3} Once it became clear that Jada's injuries were the result of child abuse, suspicion focused on her mother, Deja Ruiz, and her father, John Jones, both of whom were teenagers at the time. Further investigation led to the arrest of Jones, who was alone with Jada, her twin sister, and their two-year-old brother from approximately 8:00 a.m. until the first responders arrived in response to his 911 call. Jones was bound over by the Summit County Juvenile Court to be tried as an adult on charges of felonious assault, murder, and endangering children. A jury found him guilty of endangering children and felony murder predicated on the same offense, and the trial court sentenced him to a mandatory prison term of fifteen years to life.

II.

**ASSIGNMENT OF ERROR**

> JONES'[] CONVICTIONS FOR MURDER THROUGH THE COMMISSION OF ENDANGERING CHILDREN, AND FOR ENDANGERING CHILDREN, WERE BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW, AND WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶4} Jones' only assignment of error argues that his convictions were supported by insufficient evidence and were against the manifest weight of the evidence. Specifically, Jones has argued that his conviction for endangering children is based on insufficient evidence because the State did not produce any evidence that Jones acted recklessly. Jones has argued that his convictions are against the manifest weight of the evidence because, according to him, the

overwhelming evidence at trial established a broader time frame for Jada's injuries, which in turn calls into question his identity as the perpetrator. We disagree on both points.

SUFFICIENCY

{¶5} A challenge to the sufficiency of the evidence questions whether the evidence at trial was sufficient as a matter of law to support the defendant's conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In determining whether the evidence is legally sufficient to support the jury verdict as a matter of law, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶6} Under R.C. 2919.22(B)(1), which prohibits endangering children, no person may abuse a child under the age of eighteen. The Ohio Supreme Court has considered the culpable mental state required to prove a violation of other sections of R.C. 2919.22, and has concluded that because the statute does not specify the degree of culpability required or plainly indicate that strict liability is intended, recklessness is an essential element of the offense. *See State v. O'Brien*, 30 Ohio St.3d 122, 124 (1987) (considering the language now contained in R.C. 2919.22(B)(4); *State v. Adams*, 62 Ohio St.2d 151, 153 (1980) (considering the language now contained in R.C. 2919.22(B)(3)). The language of R.C. 2919.22(B)(1) does not require a different result, and when a defendant is charged with endangering children under that portion of the statute, the State must prove recklessness as an essential element of the offense. *See State v. Morris*, 9th Dist. No. 22089, 2005-Ohio-1136, ¶ 8. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct

is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). Recklessness, like any other essential element of an offense, may be proved through circumstantial evidence. *See State v. Hatfield*, 121 Ohio St.3d 1201, 2009-Ohio-353, ¶ 19-24.

{¶7}  In this case, the State presented sufficient circumstantial evidence from which the jury could find recklessness proven beyond a reasonable doubt. The State's expert witnesses each explained that the nature of Jada's injuries was such that extreme force had to have been exerted upon her. We need not recount in graphic detail the nature of Jada's injuries here. According to Dr. Paul McPherson, who treated Jada on the day she was admitted to the hospital, those injuries were attributable to "a very severe shaking type of a force," of an extreme nature such that "a reasonable person would know that they would harm the child." The evidence of Jada's injuries alone, coupled with the expert testimony explaining the degree of force necessary to exact that type of damage to a five-month-old child, is sufficient circumstantial evidence to establish that Jones acted with heedless indifference to the consequences of his actions and perversely disregarded the risk that injury to Jada would result.

## MANIFEST WEIGHT

{¶8}  Jones has also argued that his convictions are against the manifest weight of the evidence because, according to him, the weight of the evidence at trial established that Jada's injuries could have happened before Deja Ruiz left the house at 8:00 a.m.

{¶9}  When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (1986). In our analysis, we are mindful that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Jenks*, 61 Ohio St.3d 259 at paragraph one of the syllabus.

{¶10} Jones' argument focuses on disagreement over one piece of evidence at trial: whether he told the investigating officer soon after Jada's injuries that he had watched her drink about half of her formula that morning. Detective Gary Shadie testified that he interviewed Jones the day of the incident and that he "stated clearly" that after he laid Jada on a couch with a bottle propped in her mouth, she drank less than half of the formula. Detective Shadie preserved his recollection of the interview in written notes, but the interview was not recorded and Jones did not provide a written statement to that effect because the interview took place at the hospital. Jones' recollection is different. According to him, he did not tell Detective Shadie that Jada drank half of a bottle, but that there was half of a bottle of formula left from the night before in the bottle when he gave it to her. Jones points to the fact that the statement recorded by Detective Shadie was not made to anyone else, despite the fact that his recollection of events remained consistent through the investigation.

{¶11} The significance of this point is not immediately apparent, but the context of the statement in the timeline of events, along with the scientific testimony at trial, makes it of some importance to the case. It has not been disputed that the night before Jada was admitted to the hospital, Jones stayed at Ruiz's house with her and their three young children. The family slept in the living room, some on a mattress, and some on two couches. At this point, Ruiz's and Jones' testimony begins to diverge. Ruiz testified that during the night, she fed Jada and Jones fed her sister, but Jones testified that he did not feed either of the girls overnight. Ruiz testified that she woke around 7:00 a.m. to get ready for school and awakened Jones when she left just

before 8:00 a.m. Jones testified that he got up as Ruiz left the house, said goodbye to her and wished her luck on a test, then went back into the house to feed the twins. According to his testimony, he laid the girls on a couch on their stomachs, covered each with a blanket, and rolled the same blanket up to prop bottles of formula in their mouths before he went back to sleep on the mattress. Jones testified at trial that Jada's eyes were open and that she did not seem out of the ordinary when he gave her the bottle. He denied telling Detective Shadie that she drank half of the bottle. According to Jones, he first noticed a problem later that morning after he changed the twins' diapers, at which point he noticed that Jada was completely limp and unresponsive.

{¶12} According to Dr. McPherson, given the complexity of the mechanism that permits babies to suck, swallow, and breathe, it was "highly unlikely" that Jada could have consumed half of the formula after her injuries occurred. The State's other expert witnesses agreed with this assessment, and the State's position at trial was that because Jones told Detective Shadie that Jada had consumed half a bottle of formula – which would not have been possible had her injuries been inflicted beforehand – Jones must have shaken Jada after Ruiz left the house. Jones' argument follows from this point: according to him, if he did not see Jada drink half of the formula, then the timing of her injuries cannot be narrowed down to the period of time when he was alone with the children.

{¶13} The evidence at trial, however, was more nuanced than Jones' argument suggests. Dr. McPherson, Dr. Besunder, and Dr. Kohler did not just testify that Jada could not have consumed half a bottle of formula after her injuries were inflicted, but that she would have been unable to suck at all. In fact, they all agreed that after the shaking occurred, Jada would have been significantly and visibly impaired within a matter of minutes, including compromised respiratory function and a complete inability to suck. One expert narrowed the timing

considerably more, noting that once Jada's injuries occurred, her breathing would have been compromised quickly and, given that she was able to be resuscitated, this could not have happened more than a few minutes before the first responders arrived to administer CPR around 10:00 a.m.

**{¶14}** Although Jones adamantly denied that Jada drank half of her formula after Ruiz left the house, he testified that she did drink some. Specifically, he testified that he saw her lips "lock on the bottle and * * * she took a couple sucks." Notably, Jones' expert disagreed with the State's experts with respect to the timeframe of Jada's injuries and their ultimate effect on her cardiopulmonary system. Nonetheless, this Court has reviewed the entire record and weighed the evidence, including the conflicting expert testimony, and has concluded that the evidence does not lead to the conclusion that the jury lost its way.

**{¶15}** Jones' assignment of error is overruled.

III.

**{¶16}** Jones' assignment of error is overruled, and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

WHITMORE, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.