[Cite as *State v. McCloud*, 2012-Ohio-5220.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 11CA009966 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| RONALD MCCLOUD | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 05CR068067 |

DECISION AND JOURNAL ENTRY

Dated: November 13, 2012

CARR, Judge.

{¶1} Defendant-Appellant, Ronald McCloud, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} Janet Barnard was last seen alive on the afternoon of June 4, 2005. At that time, Barnard asked her friend if she could borrow hedge trimmers so that she could trim the hedges at her church, Living Water Christian Fellowship. Barnard was actively involved in her church and had been helping to prepare the grounds for the arrival of a special guest speaker. Witnesses saw Barnard's car in the church parking lot that day and also saw Barnard trimming bushes while it was still daylight outside.

{¶3} At approximately 9:00 a.m. the following morning, Pastor Terry Grapenthin arrived at the church to prepare for the ten o'clock service. Pastor Grapenthin observed hedge trimmers lying on the grass outside the church as well as trimmings and an extension cord. The

front door of the church was also unlocked. When Pastor Grapenthin entered the church, he noticed several other oddities. Specifically, there was a sandal in the hallway and both the fire extinguisher and an electrical box that had been bolted to the wall lay on the floor. Pastor Grapenthin picked up all of the items he observed and proceeded down the hallway to empty the garbage from the restrooms. He then opened the door to the men's room and saw a body on the floor. Pastor Grapenthin immediately left the church and called the police.

{¶4} The police soon identified the body as that of Janet Barnard. Barnard had been brutally beaten and left on the bathroom floor with her head resting on a trash can and her legs splayed open. The trash can itself was damaged, with multiple breaks in it, and the toilet in the bathroom had been broken off its bolts. There were extensive injuries on her face, scratches, bruises, and abrasions all over her body, and visible bleeding from her vaginal area. Her dress and bra had been torn, her eyeglasses and underwear were missing, and the cross from her neck lay broken on the bathroom floor. Although Barnard's car had been spotted in the church parking lot the night before, it was gone by the time her body was discovered.

{¶5} The police canvassed the area and quickly identified McCloud as a suspect after they learned that he had befriended Barnard and had been seen with her around the church within days of the murder. The police were unable to apprehend McCloud at his home when they went there, but found Barnard's car parked in the driveway next door and her purse in one of the bedrooms. Based upon a tip, the police later went to McCloud's sister's apartment in Cleveland. McCloud jumped from the second-story apartment's balcony and fled when the police arrived. Although officers gave chase, McCloud evaded them.

{¶6} McCloud turned himself in on June 7, 2005. The police photographed him at that time to document scratches he had on his upper arms, shoulders, back, legs, and knees. They

also obtained his DNA. Later testing confirmed that McCloud could not be excluded as the source of the DNA found on Barnard's dress, nipples, and fingernail scrapings.

{¶7} A grand jury indicted McCloud on sixteen counts, including capital murder. The State dismissed six counts before trial, and McCloud waived his right to a jury trial. A three-judge panel then heard evidence on all of the following counts: receiving stolen property, tampering with evidence, aggravated murder with prior calculation and design, aggravated murder (felony murder), murder, felony murder, felonious assault, rape, and two counts of kidnapping.[1] The panel found McCloud not guilty of kidnapping, but guilty of all the remaining offenses. Because the three-judge panel could not unanimously agree that a sentence of death was warranted, it imposed a sentence of life without parole.

{¶8} McCloud now appeals from his convictions and raises three assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE VERDICTS ARE AGAINST THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF MR. MCCLOUD'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO STATE CONSTITUTION.

{¶9} In his first assignment of error, McCloud argues that his convictions for aggravated murder with prior calculation and design, aggravated murder (felony murder), and rape are based on insufficient evidence. We disagree.

---

[1] The counts also included repeat violent offender specifications and specifications for having committed the enumerated crimes with sexual motivation.

{¶10} A challenge to the sufficiency of the evidence questions whether the evidence at trial was sufficient as a matter of law to support the defendant's conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In determining whether the evidence is legally sufficient to support the jury verdict as a matter of law, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The test for sufficiency requires a determination of whether the State has met its burden of production at trial." *State v. Edwards*, 9th Dist. No. 25679, 2012-Ohio-901, ¶ 7.

**Prior Calculation and Design**

{¶11} To commit aggravated murder in violation of R.C. 2903.01(A), an offender must purposely, "and with prior calculation and design, cause the death of another." McCloud argues that the State failed to prove prior calculation and design. "[T]he phrase 'prior calculation and design' * * * indicate[s] studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim." *State v. Patel*, 9th Dist. No. 24030, 2008-Ohio-4693, ¶ 33, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997).

> [T]he phrase [] require[s] evidence of more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and [] require[s] a scheme designed to implement the calculated decision to kill. While [n]either the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, momentary deliberation is insufficient.

> Nevertheless, where the evidence presented at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified.

(Internal citations and quotations omitted.) *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 38-39. "[A] prolonged period of deliberation is [] unnecessary." *State v. Hairston*, 9th Dist. No. 05CA008768, 2006-Ohio-4925, ¶ 80, quoting *Taylor v. Mitchell*, 296 F.Supp.2d 784, 821 (N.D.Ohio 2003).

{¶12} This Court has recognized that several factors may guide a prior calculation and design analysis, given that no bright-line test exists. *Hairston* at ¶ 81-82. Those factors include any prior relationship between the accused and the victim, the apparent level of thought the accused put into a choice of murder weapon or location, "whether the killing was drawn out or an instantaneous eruption of events," any expressed desire to kill on the part of the accused, any time the accused might have had to stop and reflect during the incident, the choice of the accused to immediately display a weapon and/or retrieve it at any point once the encounter ensued, any pursuit of the victim in which the accused engaged, and the number of shots fired. *Id.* The factors must then "be weighed in concert with the totality of the circumstances surrounding the murder." *Id.* at ¶ 82.

{¶13} Roger Sell, a member of Barnard's church, testified that he was at the church on the afternoon of June 1, 2005, to cut the grass. Barnard was also there at that time and introduced Sell to McCloud. Barnard told Sell that McCloud had "stopped by and offered his assistance to help plant flowers and do maintenance work on the flower beds." Sell worked at the church for about an hour that day and spoke to Barnard again before he left. At that time, Barnard indicated that she planned to take McCloud to lunch at Burger King as a thank you for the work he had done. Sell saw the two get into Barnard's car, a brown, four-door Crown Victoria.

{¶14} Roberta Grapenthin, the church pastor's wife, testified that she and Barnard planted flowers at the church a day or two before June 4, 2005. Although she was never introduced to him, Grapenthin testified that another man was present at the church that day. She described the man as a black man with a tattoo of the word "Kato" across the back of his head. The man was talking to Barnard while at the church, and Barnard later spoke to Grapenthin about the man. Barnard told Grapenthin that she had taken the man for something to eat and that "he had kind of made advances toward her." Barnard also told Grapenthin: "I know what he wants, but he's not going to get it."

{¶15} Several residents of the area surrounding the church saw McCloud around the time of the murder. Destiny Bryant testified that she and her family lived three houses away from the church and that she knew McCloud through her father, although she knew him as "Kato." Bryant saw McCloud at the church a day or two before June 4th, helping a woman plant flowers. Bryant saw the same woman trimming bushes at the church a few days later, but did not see McCloud. Both Jessica Haab and Mark Ursic testified that they were within walking distance of the church and saw McCloud on June 4th. Haab lived across the street from Ursic's grandmother, whom Ursic was visiting that day. Haab testified that she was familiar with McCloud, as he previously had dated her sister. At approximately 5:30 p.m., she observed McCloud walking in the direction of her house. McCloud was shirtless, but appeared to be carrying a red shirt with him. Haab watched as McCloud went to Ursic's grandmother's house instead and spoke with Ursic. Ursic testified that McCloud came up to him and asked him for a ride, indicating that he "was in some trouble and he needed to get out of there." Ursic observed scratches on McCloud's chest and arm while the two were speaking. Ursic informed McCloud that he could not give him a ride, but gave McCloud directions to the south side of town. Ursic

later observed McCloud walking in "a totally different [direction]" when he left his grandmother's house.

{¶16} Detective Steyven Curry testified that he conducted a neighborhood canvass while investigating Barnard's death. Detective Curry stated that the name "Sinuwine McCloud" or "Kato McCloud" surfaced during his canvass, so he relayed the name to his fellow officers. Detective Mark Carpentiere and several other officers went to McCloud's home on June 5, 2005. When the police arrived at the home, Detective Carpentiere testified, they noticed that a car matching the description of Barnard's missing car was parked in the driveway next door. The police conducted a sweep of the house for McCloud, but did not find him. They then left to get a warrant to search the home.

{¶17} McCloud's neighbor, Lewis Tolento, testified that he was at home when the police arrived at McCloud's house. He stated that the police were only at McCloud's house for a short while. Within minutes of the police leaving, Tolento observed McCloud emerge from his house covered in "dust." Tolento explained that the houses in the area have a small attic that Tolento referred to as a crawl space. Tolento described the crawl space as a small space near the rafters, containing blown-in insulation and accessible by way of a two-foot square entrance in one of the closets. When Tolento saw McCloud emerge from his home, it was Tolento's impression that McCloud was covered in dust from the blown-in insulation in the crawl space. Tolento observed McCloud jump into a blue Cadillac that had pulled up to his house. When the Cadillac pulled away, Tolento called the police to tell them what he had seen. Tolento also testified that he noticed the car that matched the description of Barnard's car in the driveway next to his own at approximately 10:00 p.m. on June 4, 2005.

{¶18} When the police later returned to McCloud's house on June 5, 2005, with a warrant, Detective Carpentiere testified that they found Barnard's purse in one of the home's bedrooms. McCloud's mother informed the police that she had seen McCloud bring the purse into the house. The police also positively identified Barnard's car as the car parked in the driveway next door. Detective Carpentiere testified that the car had last been seen in the church parking lot at 7:00 p.m. the previous night, three hours before Tolento observed the car in the driveway next door to McCloud's house. He also stated that the church was located 1.5 miles from McCloud's house.

{¶19} The police learned that McCloud's sister had taken him to her apartment in Cleveland, so they attempted to arrest McCloud there. Detective Curry entered the second-floor apartment first and soon heard "a drop to the ground from the balcony" located off of the living room. Detective Curry then looked over the balcony and saw McCloud, shirtless, running away. The police were unable to catch McCloud, but he turned himself in on June 7, 2005. The police photographed McCloud at that time and noted multiple scratches and abrasions on his arms, shoulders, back, legs, and knees.

{¶20} The State also presented forensic evidence. Jodi Ganda, a fingerprint technician for the Lorain County Crime Lab, testified that she positively matched a palm print the police discovered in the men's room of the church and a fingerprint they discovered on the interior driver's side window of Barnard's car to McCloud. Stacey Violi, a forensic scientist for the Bureau of Criminal Identification and Investigation, testified that she performed a DNA analysis on the swabs that the police collected from Barnard and McCloud. Violi was able to conclude that swabs from Barnard's dress, her nipples, and her fingernail scrapings all contained a mixed DNA profile: one profile being consistent with Barnard's DNA and the other being consistent

with McCloud's DNA. Although swabs were collected from a rape kit performed on Barnard, Violi testified that she did not test the vaginal and anal swabs. She specified that only two swabs had been taken and they were "very bloody," meaning that there would be an overwhelming amount of Barnard's DNA on them. Because other testing had confirmed that the swabs were positive for seminal fluid, but not sperm cells, any amount of male DNA on the swabs would be "very low." Accordingly, Violi stated that the items were not suitable for testing at her lab.

{¶21} Dr. Paul Matus, the Lorain County Coroner, performed Barnard's autopsy. Dr. Matus concluded that Barnard died from asphyxiation due to manual strangulation. Barnard had swelling, bruising, abrasions, and scratches on her neck, face, arms, hands, back, and legs. Dr. Matus opined that Barnard had suffered several blows to the head, neck, and back, as the deep hemorrhaging of the wounds inside her muscles evidenced blunt force trauma. Dr. Matus categorized many of Barnard's injuries, particularly the ones to her neck, as "extreme pressure" injuries. He testified that Barnard suffered deep hemorrhaging all the way down to her spine, meaning that there had been "a great deal of compression" to her neck. In examining Barnard's vaginal area, Dr. Matus testified that she suffered hemorrhaging, swelling, bruising, and hematomas. Dr. Matus stated that the area had a "considerable amount of bleeding," such that he had to wipe away blood to even be able to photograph the injuries. According to Dr. Matus, Barnard was alive when most of the injuries she sustained were inflicted. He specified that hematomas in particular require ongoing circulation of the circulatory system to form. Because Barnard had hematomas on her body, including her vagina, Dr. Matus concluded that Barnard's murder was an "ongoing event" and "not something that occurred in [a matter of] seconds."

{¶22} "Prior calculation and design must be considered in light of the 'totality of the circumstances surrounding the murder.'" *State v. Simpson*, 9th Dist. No. 11CA010138, 2012-

Ohio-3195, ¶ 18, quoting *Hairston*, 2006-Ohio-4925, at ¶ 82. Viewing all of the evidence in a light most favorable to the State, we cannot agree with McCloud's assertion that the State failed to set forth sufficient evidence of prior calculation and design. There was testimony that McCloud befriended Barnard before the murder and that he had made sexual advances towards her, which she rejected. The State produced a tremendous amount of evidence that McCloud murdered Barnard. Eyewitnesses saw McCloud with Barnard, his palmprint and fingerprint were found at the crime scene and on the driver's side of Barnard's car, and the other DNA profile found on Barnard was consistent with McCloud's DNA. Further, McCloud had scratches all over his body following the murder, the police found Barnard's purse at McCloud's house and her car in the driveway next door to his house, and McCloud twice evaded the police when they tried to find him; once by hiding in his own home and once by jumping from a second-story balcony. The details of Barnard's murder itself are both heinous and horrific. The items left in the church yard and strewn about the interior of the church hallway suggest that a struggle ensued before Barnard ended up in the men's room of the church. Barnard was then the subject of a savage attack, and expert medical testimony confirmed the unimaginable: that Barnard was still alive to sustain her injuries before being brutally strangled to death. The State produced evidence that McCloud sought out Barnard at her church and befriended her, that she declined his sexual advances, and that her murder was drawn out, leaving time for adequate reflection. *See Hairston*, 2006-Ohio-4925, at ¶ 81-82. Based on the totality of the circumstances, a rational trier of fact could have determined that the State set forth sufficient evidence of prior calculation and design. McCloud's argument to the contrary lacks merit.

**Commission or Attempted Commission of Rape**

{¶23} Aggravated murder in Ohio also may be committed by way of a felony murder. R.C. 2903.01(B). R.C. 2903.01(B) provides, in relevant part, that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * rape * * *." R.C. 2903.01(B). As relevant to McCloud's appeal, the rape statute provided that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2).

{¶24} McCloud argues his aggravated murder conviction, based on felony murder, and his rape conviction are based on insufficient evidence because the State failed to prove that he committed a rape. Specifically, he argues that there was insufficient evidence that the injuries Barnard sustained were the result of a sexual assault. As previously set forth, however, there was evidence that Barnard sustained multiple vaginal injuries, both external and internal, and had heavy vaginal bleeding. David Niemeyer, a forensic scientist for the Bureau of Criminal Identification and Investigation, also testified that he detected the presence of seminal fluid on Barnard's vaginal and rectal swabs. When the police found Barnard's body in the bathroom of the church, her dress and bra had been torn, her breast was exposed, and her legs had been left splayed open. Detective Carpentiere testified that the police never found Barnard's underwear. Additionally, there was testimony that McCloud had made sexual advances toward Barnard shortly before her murder. Viewing all the evidence in a light most favorable to the State, a rational trier of fact could have determined that the State set forth sufficient evidence that Barnard was raped and that McCloud perpetrated the crimes against her. We do not agree with McCloud that his rape conviction is based on insufficient evidence. Moreover, because we

conclude that the State presented sufficient evidence of rape, we do not agree with McCloud's assertion that his felony murder conviction is based on insufficient evidence due to the fact that evidence of the predicate offense (rape) was lacking. McCloud's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF MR. MCCLOUD'S RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO STATE CONSTITUTION.

{¶25} In his second assignment of error, McCloud argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶26} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. *Thompkins*, 78 Ohio St.3d at 387. In our analysis, we are mindful that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus.

{¶27} McCloud does not challenge the credibility or believability of any particular witness or piece of evidence, but argues that the case against him was entirely circumstantial. Yet, circumstantial evidence "inherently possess[es] the same probative value" as direct

evidence. *State v. Jones*, 9th Dist. No. 25986, 2012-Ohio-4256, ¶9, quoting *Jenks*, 61 Ohio St.3d at paragraph one of the syllabus. The State produced an overwhelming amount of circumstantial evidence in this case from witness testimony to the results of forensic testing. McCloud had scratches all over his body when the police photographed him, and his DNA profile was consistent with DNA found on Barnard's swabs. Barnard's purse was inside McCloud's house, and his mother specified that she had seen him carry it inside. Barnard's car also was in the driveway next door. Moreover, when the police tried to find McCloud, he twice evaded them. *See State v. Nichols*, 9th Dist. No. 24900, 2010-Ohio-5737, ¶ 11, quoting *State v. Taylor*, 78 Ohio St.3d 15, 27 (1997) ("It is an established principle of law that '[f]light from justice * * * may be indicative of a consciousness of guilt.'"). Based on our review of the record, this is not the exceptional case where the trier of fact lost its way by convicting McCloud. *See Thompkins*, 78 Ohio St.3d at 387. The record supports the conclusion that McCloud sought Bernard out, befriended her, sadistically murdered her, and then left her body brutally beaten and exposed in the men's room of her beloved church. McCloud's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

> MR. MCCLOUD WAS DEPRIVED OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 16 OF THE OHIO STATE CONSTITUTION.

{¶28} In his third assignment of error, McCloud argues that he did not receive a fair trial because one of the judges on his three-judge panel failed to remain impartial throughout the trial. We disagree.

{¶29} McCloud's argument is essentially that one of the judges on his three-judge panel predetermined his guilt before hearing all of the evidence at trial. "[O]pinions formed by the judge on the basis of facts introduced * * * in the course of the current proceedings * * * do not

constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). In a jury trial, a potential juror should not be excluded for cause on the basis of voicing his or her opinion "so long as [he or she] can still fairly decide the case upon the evidence presented." *Akron v. Wendell*, 70 Ohio App.3d 35, 39 (9th Dist.1990). "The legal training of the judge, as well as the integrity of one who has been chosen to a judicial position, should be a guaranty that he would be at least as competent to disregard a previously formed and expressed opinion as a juror." *Moore v. State*, 118 Ohio St. 487, 493 (1928). So long as the record supports the conclusion that the trial court did not predetermine a defendant's guilt before hearing all of the evidence, this Court will uphold the lower court's decision. *See, e.g., State v. Cusick*, 9th Dist. No. 16357, 1994 WL 117116, *5-6 (Apr. 6, 1994).

{¶30} During the coroner's testimony, the presiding judge of the three-judge panel ruled that the State would not be permitted to ask how long it might take a victim to die from compression of the jugular. When the State expressed concern that the ruling might hamper its ability to show prior calculation and design, the presiding judge opined that the evidence was such that whoever had committed the crime against Barnard had planned it. The judge later clarified his statement and explained that it was in no way intended to suggest that the State already had proven its case against McCloud. Rather, he meant to convey that, whoever the perpetrator of Barnard's murder, the act of strangulation allows for more than momentary deliberation and, therefore, supports a finding of prior calculation and design.

{¶31} McCloud points to the presiding judge's remarks as proof that he formed an opinion about McCloud's guilt before hearing all of the evidence. He relies upon *Irvin v. Dowd*,

366 U.S. 717 (1961), wherein the United States Supreme Court held that jurors must remain impartial. In that case, however, the Supreme Court held that:

> scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

(Emphasis added.) *Irvin* at 722-723. That a trier of fact prematurely expresses an opinion is not cause for reversal so long as the record demonstrates that the trier of fact was able to render a decision upon the evidence actually introduced. *Id.*

**{¶32}** The presiding judge at McCloud's trial specified on the record that he had not reached any conclusion about McCloud's involvement in Barnard's death. Although the judge commented on the element of prior calculation and design, there is nothing in the record to support the conclusion that he actually predetermined McCloud's guilt before hearing on the evidence. Rather, he explicitly stated that he had not formed such an opinion. Upon review of the record, we do not agree that McCloud was deprived of a fair trial. As such, McCloud's third assignment of error is overruled.

### III.

**{¶33}** McCloud's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

WHITMORE, P. J.
MOORE, J.
CONCUR.

APPEARANCES:

PAUL GRIFFIN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.